## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ )<br>**B2 OPPORTUNITY FUND, LLC,** )<br>**DIRECTLY AND AS ASSIGNEE OF** )<br>**ZNERGY, INC., F/K/A MAZZAL** )<br>**HOLDING CORP., a Nevada corporation,** )<br> )<br>**Plaintiff,** )<br> )<br>**v.** )<br> )<br>**NISSIM S. TRABELSI, A/K/A SHAWN** )<br>**TELSI, INDIVIDUALLY AND AS** )<br>**TRUSTEE OF THE MAZZAL TRUST,** )<br>**A/K/A THE MAZZAL LIVING TRUST,** )<br>**AND THE BANY'S LIVING TRUST;** )<br>**ALIZA TRABELSI, INDIVIDUALLY** )<br>**AND AS TRUSTEE OF THE BANY'S** )<br>**LIVING TRUST; MAZZAL HOLDING** )<br>**CORP., a Massachusetts corporation;** )<br>**C. PARKINSON LLOYD, ESQ.;** )<br>**KIRTON McCONKIE, P.C.; VSTOCK** )<br>**TRANSFER, LLC; AND MAGNOLIA** )<br>**ROAD LLC,** )<br> )<br>**Defendants** )<br>_____) | | **C.A. # 16-_____** |

## PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT FOR DAMAGES AND INJUNCTIVE AND OTHER EQUITABLE RELIEF, AND JURY TRIAL DEMAND

Plaintiff B2 Opportunity Fund, LLC, a Nevada limited liability company ("B2"), directly

and as claim assignee of Znergy, Inc. f/k/a Mazzal Holding Corp., a Nevada corporation

("Znergy-Mazzal") files this Original Complaint  and hereby states for its claims against

Defendants Nissim S. Trabelsi, a/k/a Shawn Telsi ("Trabelsi"), individually and as Trustee of the

Mazzal Trust a/k/a The Mazzal Living Trust and The Bany's Living Trust; Aliza Trabelsi,

individually and as Trustee of The Bany's Living Trust;  Mazzal Holding Corp., a Massachusetts

1

corporation;  C. Parkinson Lloyd, Esq.;  Kirton McConkie, P.C.; VStock Transfer, LLC; and

Magnolia Road LLC as follows:

## I.     NATURE OF THE ACTION

1.  This is an action resulting from, in summary:

(A) Defendant Trabelsi's securities fraud, deceit, misrepresentations, fraudulent conversions

of shares, and unfair and deceptive acts and practices, with Defendant VStock's

participation, in connection with a sale of shares of stock in Znergy-Mazzal, a public

company, that Defendant Trabelsi, through multiple names and capacities, agreed to

consummate;

(B) Defendant Trabelsi's use of other alter egos and controlled vehicles, including without

limitation The Bany's Living Trust and Magnolia Road LLC, to help him perpetrate his

fraud scheme and to receive and enjoy the benefits thereof with his wife, Defendant Aliza

Trabelsi;

(C) the fraudulent conversion and transfer of approximately 25 acres of real property known

as 165 Rear and 171 Hart St., Taunton, Massachusetts (the "Property") by Defendant

Trabelsi;

(D) the participation in the securities fraud, or, in the alternative, gross negligence and

breaches of fiduciary duty, by Defendant VStock; and

(E) the gross negligence, breaches of fiduciary duty and other torts committed by Defendants

C. Parkinson Lloyd, Esq. ("Lloyd") and his law firm, Kirton McConkie, P.C. ("Kirton"),

both as escrow agent and as attorneys representing Defendant Trabelsi, Znergy-Mazzal

and Plaintiff B2 in a conflict situation.

## II. PARTIES

2.  Plaintiff B2 is a Nevada limited liability company with a registered office at 606 S. 9th Street, Las Vegas, NV 89101.

3.  Znergy-Mazzal (whose claims and causes of action herein against the Defendants Plaintiff B2 asserts as assignee by written assignment) is a Nevada corporation with a corporate address and office located at 6102 South MacDill Avenue, Suite G, Tampa, Florida 33611; however, at most relevant times and in any event until its Board of Directors approved a change in Znergy-Mazzal's corporate address on or about March 21, 2016, its official corporate address as confirmed in its filings as a reporting company with the U.S. Securities & Exchange Commission ("SEC") was 1625 VFW Parkway, Boston, Massachusetts 02132.

4.  Znergy-Mazzal was named "Mazzal Holding Corp." until a Certificate of Amendment to the Articles of Incorporation was filed with the Nevada Secretary of State on or about July 14, 2016 changing its name to "Znergy, Inc."

5.  Defendant Trabelsi is an individual who resides in Massachusetts and has used numerous addresses in Suffolk and Middlesex Counties, Massachusetts over the past few years, including:

> (A) 1625 VFW Park Way, Boston, MA 02132, the address that he gave Plaintiff B2 in the Stock Purchase Agreement referenced below but which is a vacant lot;
>
> (B) 675 VFW Parkway, Suite 189, Chestnut Hill, MA 02467, an address that he provided for Znergy-Mazzal and Boston Investment & Development Corp. (Znergy-Mazzal's original name) in a November 21, 2013 Quitclaim Deed and to Defendant VStock as Znergy-Mazzal's transfer agent (as reflected in its stock transfer records), but which is actually a UPS store with no Suite 189, only delivery boxes;

(C) 73 Truman Rd., Newton, MA 02459, the address that (i) is listed for himself as registered agent in connection with the formation of Defendant Mazzal Holding Corp. as a Massachusetts corporation in the November 11, 2015 Articles of Incorporation (in which he is listed as sole Director, President, Treasurer, Secretary and Registered Agent):  (ii) that is shown for The Bany's Living Trust (of which Defendant Trabelsi and his wife, Defendant Aliza Trabelsi, are trustees and beneficiaries) in a mortgage filed of record on or about September 30, 2016 securing a $1.3 million loan from that trust to Magnolia Road LLC, another entity controlled by Trabelsi (of which he is Manager and Registered Agent) that mortgaged property at 50 Magnolia Road, Natick, MA 01760; and (iii) that is shown in the records of the Secretary of the Commonwealth for Trabelsi as Registered Agent and Manager of Magnolia Road LLC, which was formed of record on or about December 8, 2015;

(D) 20 Burrage Rd., Newton, MA 02459, an address that Trabelsi provided for the The Mazzal Living Trust, of which he has been Trustee at relevant times, to Defendant VStock, Znergy-Mazzal's transfer agent, as reflected in such transfer agent's Certified Shareholder List effective December 31, 2015 and stock transfer lists current through at least June 2016;

(E) 50 Mangolia Rd., Natick, MA 01760, which is the address stated for: (i) The Bany's Living Trust (of which Defendant Trabelsi and his wife, Defendant Aliza Trabelsi, are trustees and beneficiaries) in an August 8, 2016 purported deed of the Property from Defendant Mazzal Holding Corp., a Massachusetts corporation, to The Bany's Living Trust, a true and correct copy of which, as obtained electronically from the

Bristol County Registry of Deeds, is attached hereto as Exhibit A, and (ii) in the

mortgage filed of record on or about September 30, 2016; and

(F) For at least the purpose of receiving invoices from Znergy-Mazzal's transfer agent,

Defendant VStock, Defendant Trabelsi provided the address of 674 Centre Street,

Newton, MA 02458.

6.   On information and belief, based on the information in paragraph 5 above,

Defendant Trabelsi's last known residential address is 73 Truman Rd., Newton, Massachusetts or

50 Magnolia Road, Natick, Massachusetts.

7.   On information and belief, Defendant Trabelsi also is an Israeli citizen.

8.   Defendant Trabelsi has confirmed in publicly-filed real estate deeds (signed by him

and notarized) that he has used the name and is the same person as "Shawn Telsi".

9.   Exhibit B hereto is a true and correct copy of a Deed filed in the Middlesex County

Registry of Deeds containing the notarized signature of Defendant Trabelsi with a signature

block stating, "Nissim Shimon Trabelsi f/k/a Shawn Telsi".

10.   Exhibit C hereto is a true and correct copy of a Quitclaim Deed filed in the Bristol

County Registry of Deeds containing the notarized signature of Defendant Trabelsi with a

signature block stating, "Shawn Telsi, a/k/a Nissim Trabelsi".

11.   The name "Telsi" appears to be simply "Trabelsi" with the letters "rab" removed,

and Defendant Trabelsi's middle name is Shimon, similar to Shawn.

12.   Defendant Aliza Trabelsi is Defendant Trabelsi's wife and his co-trustee and co-

beneficiary of The Bany's Living Trust and, on information and belief, her last known residential

address is either 73 Truman Road, Newton, Massachusetts or 50 Magnolia Road, Natick,

Massachusetts.

13.     Defendant Mazzal Holding Corp. ("Massachusetts Mazzal") is a Massachusetts corporation formed on or about November 11, 2015 with a principal business address filed with the Massachusetts Secretary of the Commonwealth of 73 Truman Rd., Newton, Middlesex County, Massachusetts 02459.

14.     Defendant Trabelsi is Defendant Massachusetts Mazzal's registered agent for service of process, and his address as registered agent is 73 Truman Road, Newton, Massachusetts in the records of the Secretary of the Commonwealth.

15.     The Bany's Living Trust (the "Trust") is a Massachusetts trust that, on information and belief, is an alter ego of Defendant Trabelsi and a family trust vehicle for himself and his wife, Defendant Aliza Trabelsi, as trustees and primary beneficiaries to control or receive benefits related to his fraudulent activities described herein, including without limitation the Property.

16.     Exhibit D hereto is a true and correct copy of the Declaration of Trust for The Bany's Living Trust as filed in the Norfolk County Registry of Deeds.

17.     Defendant C. Parkinson Lloyd, Esq. ("Lloyd") is an individual attorney domiciled in Utah whose last known business address is 50 East South Temple St., Suite 400, Salt Lake City, Utah 84111.

18.     Defendant Kirton McConkie, P.C. ("Kirton") is a Utah law firm and professional corporation with a last known business address of 50 East South Temple, Kirton McConkie Building, Suite 400, Salt Lake City, Utah 84111, and whose President is Lorin C. Barker.

19.  Defendant Kirton's registered agent for service of process is Cameron M. Hancock, whose address as registered agent is 50 East South Temple, Kirton McConkie Building, Salt Lake City, UT 84111.

20.  At relevant times, Defendant Lloyd was (and, on information and belief, still is) an attorney and shareholder of Defendant Kirton and was acting as its authorized agent and principal when committing the acts and omissions described in this Complaint.  Defendant Kirton has respondeat superior liability for the actions and omissions of Defendant Lloyd.

21. Defendant VStock Transfer, LLC ("VStock") is a California limited liability company with a business address at 18 Lafayette Place, Woodmere, New York, 11598, whose Chief Executive Officer is Yoel Goldfeder.

22. Defendant VStock's California registered agent and registered agent address for service of process are Yoel Goldfeder, 5670 Wilshire Blvd., Suite 1530, Los Angeles, CA 90036.

23. The address to which the New York Department of State will mail process if accepted on behalf of Defendant VStock is 18 Lafayette Place, Woodmere, New York 11598.

24. Defendant Magnolia Road LLC is a Massachusetts limited liability company ("Magnolia") in which, at relevant times, Defendant Trabelsi  has been the registered agent, sole manager, and sole person authorized to execute recordable instruments purporting to affect an interest in real property.

25. Defendant Magnolia's registered agent is Defendant Trabelsi, and his address as registered agent on file with the Secretary of the Commonwealth is 73 Truman Rd., Newton, MA 02459.

## II.     JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this case under 15 U.S.C. § 78(aa), 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 28 U.S.C. § 1332(a) (complete diversity of citizenship exists between Plaintiffs and the Defendants, and because the amount in controversy, exclusive of interest and costs, exceeds $75,000).

27. This Court has personal jurisdiction over Defendants Lloyd, Kirton, and VStock pursuant to M.G.L. c.223A §3 (the Massachusetts Long Arm Statute), including paragraphs (c) and (d) thereof, and such jurisdiction does not offend due process, for the reasons stated in subparagraphs 28.A-O below, incorporated in this paragraph by reference, and based on facts alleged elsewhere in this Complaint.

28. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and Section 27 of the Exchange Act [15 U.S.C. §78aa],  because:

A. A substantial part of the acts constituting violations of Section 10(b) of the U.S. Securities Exchange Act of 1934 [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] occurred in the District of Massachusetts;

B. At all relevant times, Defendant Trabelsi and his wife, Defendant Aliza Trabelsi, have resided in Massachusetts;

C. The Bany's Living Trust is a Massachusetts trust doing business in Massachusetts through its Trustees, Defendant Trabelsi and Aliza Trabelsi;

D. Mazzal Holding Corp., a Massachusetts corporation, has a principal office address and registered agent address in Massachusetts and does business in Masssachusetts;

E. The Amended Master Stock Purchase Agreement (the "SP Agreement") under which Defendant Trabelsi in various capacities agreed to sell shares of Zynergy-Mazzal stock to Plaintiff B2 at issue in this Complaint (a true and correct copy of which, as signed and emailed by Defendant Trabelsi to Defendant Lloyd, is an attachment to the e-mail chain of which Exhibit E hereto is a true and correct copy) explicitly provides as follows:

"6.6 Jurisdiction; Service of Process. EACH PARTY (A) CONSENTS TO THE PERSONAL JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN SUFFOLK COUNTY, MASSACHUSETTS (AND ANY CORRESPONDING APPELLATE COURT) IN ANY PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENT (UNLESS OTHERWISE STATED TO THE CONTRARY IN ANY TRANSACTION DOCUMENT), (B) WAIVES ANY VENUE OR INCONVENIENT FORUM DEFENSE TO ANY PROCEEDING MAINTAINED IN SUCH COURTS AND (C) EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, AGREES NOT TO INITIATE ANY PROCEEDING ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENT (UNLESS OTHERWISE STATED TO THE CONTRARY IN ANY TRANSACTION DOCUMENT) IN ANY OTHER COURT OR FORUM. PROCESS IN ANY SUCH PROCEEDING MAY BE SERVED ON ANY PARTY ANYWHERE IN THE WORLD.  [capital letters in the original document]

6.7 Venue. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF MASSACHUSETTS IN EACH CASE LOCATED IN THE COUNTY OF SUFFOLK COUNTY, MASSACHUSETTS, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  [capital letters in the original document]

F.  Section 12.8 of the SP Agreement also explicitly provides that Massachusetts

law governs, stating:

12.8    Governing Law.  This Agreement and all other Transaction Documents (unless otherwise stated therein) will be governed by the laws of the State of Massachusetts without giving effect to any choice or conflict of law principles of any jurisdiction."

G.  Defendant Trabelsi sent emails to Plaintiff B2 from Massachusetts before,

during and after the sale of shares contemplated by the SP Agreement, as further detailed below;

H.  Defendants Lloyd and thus Kirton (collectively called the "Lawyer Defendants") drafted the SP Agreement, including the provisions requiring jurisdiction and venue of any dispute arising under the SP Agreement to be in Suffolk County, Massachusetts;

I.   The Lawyer Defendants drafted the Amended Escrow Agreement (the "Escrow Agreement") by and among Defendant Lloyd, Defendant Kirton, Defendant Trabelsi, "Shawn Telsi", The Mazzal Trust, and Znergy-Mazzal in connection with the SP Agreement (a true and correct copy of the Escrow Agreement as signed and e-mailed by Defendant Trabelsi to Defendant Lloyd is an attachment to the e-mail chain of which Exhibit E is a true and correct copy with later forwarding information redacted);

J.   The Escrow Agreement was prepared by the Lawyer Defendants in order "[t]o complete the transactions contemplated by the SPA [the SP Agreement]", per paragraph 3 of the Escrow Agreement Recitals, and paragraph 1.2(f) of the SP Agreement contains the following explicit reference to the Escrow Agreement: "The Parties have appointed Kirton McKonkie to act as Escrow Agent pursuant to that Escrow Agreement of even or near date herewith";

K.  The Escrow Agreement was an integral part of the document ensemble prepared by the Lawyer Defendants to effectuate the securities sale contemplated by the SP Agreement, which is explicitly governed by Massachusetts law and subject to exclusive venue and jurisdiction in Suffolk County, Massachusetts;

L.   Notwithstanding the Escrow Agreement's reference to Utah law as governing its interpretation (section 9), the Escrow Agreement had no jurisdiction and venue clause of its own (while the SP Agreement requires jurisdiction and venue to be in Suffolk County, Massachusetts, as quoted above);

M.  Section 11 of the Escrow Agreement provides that Defendant Kirton is counsel to "the Company" (Znergy-Mazzal, then called "Mazzal Holding Corp."), and that company's principal office and CEO at the time (and during the three months of negotiations that led to the final SP Agreement and Escrow Agreement), Defendant Trabelsi, were located in and conducting business in Massachusetts;

N.  The Property is located in Taunton, Bristol County, Massachusetts, while the Defendants involved in both sides of the Property's most recent transfer, Defendant Massachusetts Mazzal and The Bany's Living Trust, have published principal business office addresses in Massachusetts, as stated above; and

O.  Defendant VStock performed services for Znergy-Mazzal while it was based in Massachusetts, and VStock delivered invoices to Znergy-Mazzal in Massachusetts, including without limitation the invoice of which a true and correct copy is attached hereto as Exhibit F.

## IV.  FACTUAL ALLEGATIONS

### A. The Background Original Transaction and Znergy-Mazzal Share Structure

29. In or about August 2015, Defendant Lloyd solicited Peter M. Peterson ("Peterson"), Managing Member of Plaintiff B2, to consider an acquisition transaction involving Znergy-Mazzal, then a client of Defendants Lloyd and Kirton (collectively the "Lawyer Defendants") named "Mazzal Holding Corp.".

30.    As Mazzal Holding Corp., a Nevada corporation, the stock of Znergy-Mazzal was quoted at relevant times on the OTC MARKETS' OTC QB MARKET (the "OTC Market") and traded in the "pink sheets" under the symbol "MZZL".

31.    Since on or about June 22, 2015, 12,000,000 shares of Znergy-Mazzal stock have

been publicly tradeable based on filings with the SEC (and are collectively called the "Free-Trading Shares").

32.    The Free-Trading Shares became freely tradeable in two blocks described as follows:

(A)  2,000,000 shares (the "2,000,000 Free-Trading Shares") that were the subject of an S-1 registration statement filing with the SEC dated on or about June 10, 2013 and prepared with Defendant Lloyd's participation (and subsequently amended), in which it was disclosed that Defendant Trabelsi owned 478,000 of those shares individually and 1,500,000 of those shares through The Mazzal Trust (of which, at relevant times, he has been Trustee); and

(B) 10,000,000 shares (the "10,000,000 Free-Trading Shares") that Defendant Trabelsi caused to be issued by Znergy-Mazzal on or about June 22, 2015, pursuant to an S-8 registration statement filed with the SEC on or about April 7, 2015 concerning up to 50,000,000 shares that might be issued pursuant to a stock option plan (and in which the owner of the 10,000,000 Free Trading Shares actually issued was not specified by name).

33.    Certificate number 49 representing the 10,000,000 Free-Trading Shares was issued on or about June 22, 2015, in the name of Cede & Co., which is a "street name holder" and possessory custodial agent for the physical certificates representing shares that are publicly traded by buyers and sellers as beneficial owners through on-line quotation systems and brokers. (The true beneficial owners' names do not appear on the stock certificate, and only beneficial owners who have consented to disclosure appear on a NOBO -names of beneficial owners- list if and when an issuer requests it from a third party service)

34.   The 10,000,000 Free-Trading Shares were controlled by Defendant Trabelsi using

one or more beneficial owner names, including without limitation his admitted alias, "Shawn Telsi".

35.   The Lawyer Defendants actively encouraged a transaction with Defendant Trabelsi and Znergy-Mazzal (then called "Mazzal Holding Corp.").

36.  Defendant Lloyd set up the first call between Znergy-Mazzal's sole Director and CEO at the time, Defendant Trabelsi and Peterson on or about August 18, 2015 and repeatedly offered Defendant Lloyd's assistance to Peterson to make a proposal to Defendant Trabelsi for such a transaction.

37. Ultimately a corporation named Global ITS, Inc., a Wyoming corporation, entered into a Stock Exchange Agreement with Znergy-Mazzal dated October 26, 2015 (the "Global Stock Exchange Agreement").

38. Under the Global Stock Exchange Agreement, the shareholders of Global ITS (including without limitation Plaintiff B2) exchanged their 24,000,000 shares of Global ITS for 120,000,000 newly issued shares of Znergy-Mazzal (then called "Mazzal Holding Corp."), which then had 330,000,000 shares outstanding.

39. Of those 330,000,000 shares outstanding, Defendant Trabelsi owned and controlled at least 205,300,000 shares-45,800,000 restricted shares held in his own name, 9,500,000 shares held in street name of Cede & Co. with "Shawn Telsi" as the declared beneficial owner, and 150,000,000 shares held in the name of The Mazzal Trust, of which Trabelsi was Trustee.

40. Global ITS was focused on marketing energy efficiency and commercial security products, and its wholly-owned subsidiary, Znergy, Inc., a Florida corporation, was focused on financing energy efficiency and commercial security projects.

**B.  The Lawyer Defendants' Conflicting Representation and Roles Begin**

41.   Prior to and at the time of the execution of the Global Stoock Exchange Agreement,

Christopher J. Floyd ("Floyd") was the President of Global ITS.

42.   During the period August 18, 2015 through late October 2015, Defendant Lloyd

repeatedly gave legal advice to Peterson and to Floyd  in connection with the Mazzal-Global ITS

transaction as it was proceeding and until the finalization and execution of the Global Stock

Exchange Agreement on or about October 26, 2015.

43.  Throughout the negotiation and structuring of the transaction, the Lawyer Defendants

engaged in representation of and giving advice to both sides, Defendant Trabelsi and  Znergy-

Mazzal (then called "Mazzal Holding Corp."), the Lawyer Defendants' existing clients when the

stock transaction discussions began on August 18, 2015, on the one hand, and the Global

ITS/Znergy side, on the other hand.

44.  In a September 24, 2015 e-mail to Peterson and Defendant Trabelsi, Defendant Lloyd

even wrote that he was "trying to figure out just who I represent."

45. In fact, the Lawyer Defendants' exuberance at being the sole legal counsel "for the

deal" and actively representing and advising all sides and soliciting legal business from both

sides of the transaction, rather than clearly representing one party without conflict, was

exemplified by numerous communications from Defendant Lloyd, including without limitation

the following:

(A)  In an August 24, 2015 e-mail that he sent to Peterson, Defendant Lloyd wrote,

"Please let me know if there's anything I can do on the other projects you were talking about

today.  Hope the trip goes well and that you like what you see at the plant."

(B)  In a September 24, 2015 e-mail that Defendant Lloyd sent to Peterson and Floyd,

Defendant Lloyd wrote, "Let me know how I can help the deal come together."

(C)  In an October 19, 2015 e-mail that he sent to Peterson and Floyd, Defendant Lloyd wrote, "Is there anything that I can do to help move things forward? I know you and CJ [Floyd] have deals lined up and ready to go for when Nissim is ready to move.  Please let me know if I can help with anything."

(D)  In an October 27, 2015 e-mail that Defendant Lloyd sent to Peterson, Floyd and Defendant Trabelsi, Defendant Lloyd wrote, "I look forward to working with all of you going forward."

(E)  In a November 10, 2015 e-mail that Defendant Lloyd sent to Peterson and Floyd, Defendant Lloyd wrote, "How are the other projects going? On the list, it looks like there were a couple more LOIs to prepare, as well as the $500K convertible debenture raise. If I can help with any of those, please let me know."

46.     The Lawyer Defendants did not obtain a written waiver of conflict of interest representation of both sides of the transaction from anyone representing Global ITS or Znergy, nor did the Lawyer Defendants provide Peterson, Floyd, or Global ITS (nor, to Plaintiff B2's knowledge, Znergy-Mazzal) any written disclosures explaining fully the nature and risks to Global ITS and Znergy-Mazzal of the conflict representation and confusing role that the Lawyer Defendants were playing.

47.     After the Znergy-Mazzal share exchange transaction with Global ITS,  Global ITS held 120,000,000 shares of Znergy-Mazzal, and Global ITS was a wholly-owned subsidiary of Znergy-Mazzal.

### C. The Second Stock Sale Transaction and Final Stock Purchase Agreement

48.    Global ITS quickly encountered many difficulties in working with Defendant Trabelsi, so a second transaction was negotiated over a period of approximately three months.

49.  The focal point of the second transaction was that Defendant Trabelsi, individually and as Trustee of The Mazzal Trust, would sell to Plaintiff B2 all of his shares of stock in Znergy-Mazzal held in each such capacity, and that the majority of the 12,000,000 Free-Trading Shares would be sold by the person who Defendant Trabelsi identified at that time as the owner of 9,500,000 of those shares, "Shawn Telsi", his alleged brother-in-law, thereby providing Plaintiff B2 with a supermajority control over the issued and outstanding shares of Znergy-Mazzal and with ownership of the large majority of the 12,000,000 Free-Trading Shares.

50.  Defendant Trabelsi did not disclose to Plaintiff B2 that "Shawn Telsi" was an alias and alter ego name that he had used and confirmed as such in prior real estate transactions.

51. In a November 19, 2015 term sheet for the second transaction, as proposed by Defendant Trabelsi and documented by the Lawyer Defendants (the "Term Sheet"), a true and correct copy of which is Exhibit G hereto, Defendant Trabelsi and the Lawyer Defendants represented to Plaintiff B2 that:

(A) the "Sellers" and their respective shareholdings were Nissim Trabelsi, 45,800,000 shares of common stock, The Mazzal Trust, 150,000,000 shares, and Shawn Telsi, 9,500,000 shares;

(B) "Mr. Telsi received the Telsi Shares in connection with consulting services provided to the Company [Znergy-Mazzal], pursuant to the Company's stock option plan, and the Telsi Shares were issued pursuant to a Registration Statement on Form S-8"; and

(C)  "By signing below, the Sellers represent and warrant that the share ownership

16

provided above is correct and accurate, and represents 100% of the shares owned by each Seller. The total issued and outstanding shares of the Company is 210,000,000 shares of common stock,"

52.  Further negotiations resulted in the SP Agreement effective as of February 4, 2016, by and among Defendant Trabelsi, "Shawn Telsi" (Defendant Trabelsi's admitted alias), The Mazzal Trust (of which Defendant Mazzal was Trustee), Znergy-Mazzal (then still named "Mazzal Holding Corp."), and Plaintiff B2.

53. Under the SP Agreement, a true and correct copy of which is an attachment to <u>Exhibit E</u> hereto:

(A) Nissim Trabelsi agreed to sell 45,800,000 shares of Znergy-Mazzal stock (called the "Trabelsi Shares") to Plaintiff B2 or its designee;

(B) "Shawn Telsi" agreed to sell 9,500,000 shares of Znergy-Mazzal stock (called the "Telsi Shares" in the SP Agreement and the "Free-Trading Telsi Shares" herein) to Plaintiff B2 or its designee; and

(C) The Mazzal Trust agreed to sell 149,950,000 of its 150,000,000 shares of Znergy-Mazzal common stock (called the "Transferred Trust Shares" in the SP Agreement).

54.  Under the SP Agreement and the Escrow Agreement, the net purchase price for the sale of the Trabelsi Shares, the Free-Trading Telsi Shares, and the Trust Shares collectively was:

(A) $315,000 cash for the Trabelsi Shares and the Free-Trading Telsi Shares; and

(B) The transfer of real estate (called the "Property") by Znergy-Mazzal to The Mazzal Trust, which real estate was described as, "the land and all buildings thereon known as 171 Hart St., Taunton, MA 02780…approximately 25 acres"; and

(C) Although not part of the "net purchase price" payable directly to the sellers, Plaintiff B2 also agreed to fund a payment of $10,000 in legal fees to Defendant Kirton (that Defendant Trabelsi acknowledged to Peterson were in addition to approximately $30,000 in legal fees that he and Znergy-Mazzal owed to Defendant Kirton but could not pay), reflected in Escrow Agreement paragraph 3.b, and $5,000 to Defendant VStock that is not expressly stated in the referenced agreements (but that Defendant Trabelsi acknowledged to Peterson was owed by Znergy-Mazzal to Defendant VStock that neither it nor he had the funds to pay).

55.     At the time of signing the SP Agreement, Plaintiff B2 did not know that "Shawn Telsi" was an alias used by Defendant Trabelsi for himself in real estate transactions and had not seen the documents attached hereto as Exhibit B and Exhibit C.

56.     The 9,500,000 shares reflected in the SP Agreement as held by "Shawn Telsi" were part of the 10,000,000 Free-Trading Shares held in street name by Cede & Co.

57.     The other 45,800,000 shares, held by Defendant Trabelsi in his own name, were restricted shares (they had never been registered with the SEC for sale).

58.     The Certified Shareholder List for Znergy-Mazzal as of December 31, 2015 prepared and delivered by Defendant VStock, a true and correct copy of which is Exhibit H hereto (with personal names not currently at issue redacted), confirms that the 45,800,000 shares represented by certificate number 35 in the name of Nissim Trabelsi were "restricted" shares.

59.     That same Certified Shareholder List shows that "Shawn Telsi" had only 50,000 unrestricted shares and that there were 12,000,000 active shares held in the name of Cede & Co., (the "street name" holder acting as an agent of the beneficial owners), including 10,000,000 shares issued on or about June 22, 2015.

18

60.     The Free-Trading Telsi Shares had the highest value per share of the three blocks of shares contracted to be sold under the SP Agreement and were a highly material part of the value represented by the aggregate 205,250,000 shares of Znergy-Mazzal stock that Plaintiff B2 agreed to purchase under that agreement, because (a) they could legally be sold to the investing public through the OTC Market; and (b) they represented slightly over 79% of the 12,000,000 Free-Trading Shares of Znergy-Mazzal stock.

61.     It was important to Plaintiff B2 and to Znergy-Mazzal that Plaintiff B2 or its designees own the Free-Trading Telsi Shares, because, among other reasons, Znergy-Mazzal's incoming President and CEO, Floyd, had plans to begin almost immediately to seek to raise additional capital for Znergy-Mazzal through private placement sales of newly issued stock in Znergy Mazzal at a price of $0.25 per share (which Znergy-Mazzal and Plaintiff B2 believed was reflective of the acquisition of Global ITS and the new management's growth plans).

62.     Any injudicious or recklessly timed sales of the Free-Trading Telsi Shares into the OTC Market predictably would have the effect of suppressing the published trading price for shares of stock in Znergy-Mazzal in the OTC Market and thus interfere with an orderly private placement process at a set price for the original issuance shares to be sold in that process.

D.  **Misrepresentations Concerning the Property By Defendants Trabelsi and the Lawyer Defendants**

63.     In the SP Agreement, Defendant Trabelsi and the Lawyer Defendants knowingly or, at a minimum, recklessly in conscious disregard of the truth, misrepresented the basis on which The Mazzal Trust would receive the Property in return for cancellation of the Transferred Trust Shares.

64.     Paragraph E of the Recitals, drafted by the Lawyer Defendants, states, "the Trust acquired the Trust Shares [the full 150,000,000 shares] in connection with a sale by the Trust of

property (the "Property") consisting of "the land and all buildings thereon known as 171 Hart St.,

Taunton, MA 02780."

65.    In fact, The Mazzal Trust did not sell the Property to Plaintiff Znergy-Mazzal (nor

to anyone else), and The Mazzal Trust had never had legal title to the Property.

66.    Rather, Defendant Trabelsi on behalf of various entities and names had

transferred the Property repeatedly, including as follows:

(A)    Non-Stop LLC, by Quitclaim Deed filed of record on or about May 7, 2007 and

signed by "Shawn Telsi" as President, conveyed the Property to Green Pines, LLC;

(B)    Green Pines LLC, by Quitclaim Deed filed of record on or about November 7,

2012 and signed by Defendant Trabelsi as Manager (Exhibit I hereto is a true and correct copy of

the Deed obtained electronically), conveyed the Property to an individual named "Mazzal Ilooz"

(on information and belief, Defendant Trabelsi's mother);

(C)    Mazzal Ilooz, by Quitclaim Deed filed of record on or about May 29, 2013 and

signed by Defendant Trabelsi as Attorney in Fact, conveyed the Property to Boston Investment

and Development Corp., Plaintiff Znergy-Mazzal's name until Defendant Trabelsi caused the

company's name to be changed to "Mazzal Holding Corp." (Exhibit J hereto is a true and correct

copy of the Deed);

(D)    Boston Investment and Development Corp. by Quitclaim Deed dated November

21, 2013 and signed by Defendant Trabelsi conveyed the Property to "Mazzal Holding Corp."

(Exhibit K hereto is a true and correct copy of the Deed).

67.    Moreover, the SP Agreement misdescribes the "Property" as solely at 171 Hart St.;

each of the referenced deeds shows that the single Lot 2 described therein comprises the rear of

165 Hart Street and 171 Hart Street.

### E.  The Lawyer Defendants' Conflicting Representations and Roles in the Second Transaction

68.   Defendant Kirton, acting through Defendant Lloyd, drafted the SP Agreement and the Escrow Agreement, while purporting in conversations between November 2015 and February 2016, inclusive to be the "lawyer for the deal" or the "lawyer for the transaction", without clarification of whom the Lawyer Defendants were and were not representing and without full and fair disclosure to Plaintiff B2 concerning the risks to Plaintiff B2 of the Lawyer Defendants being the only attorneys drafting and reviewing the SP Agreement, until some half-hearted, confusing and disingenuous limitations later in the process that were contradicted by the Lawyer Defendants' actual conduct:

(A)      In a January 30, 2016 e-mail, Defendant Lloyd wrote, "…because I have worked with both Mazzal Holding and with Pete and CJ,  I cannot represent either party in this transaction and can only transmit proposed terms, draft agreements to memorialize the agreed upon terms, and clarifying points where there are questions"; and

(B) Then, contradicting that caveat and assertion, the Lawyer Defendants provided in the Escrow Agreement as follows: "The parties acknowledge that the Escrow Agent [Defendant Kirton] is counsel for the Company [Plaintiff Znergy-Mazzal]. Notwithstanding this relationship, Escrow Agent hereby agrees to carry out his duties as Escrow Agent in an impartial and professional manner."

69.   Yet, when the Lawyer Defendants were preparing the documentation for and acting as escrow agent for the share sale transaction reflected in the SP Agreement, during the period November 2015 through February 2016, the Lawyer Defendants also were providing legal counsel and services to Plaintiff B2 and Floyd (who had become an officer in Znergy-Mazzal upon the closing of the October 26, 2015 transaction) on issues related to the same transaction,

on SEC disclosure filing obligations as shareholders, and on an agreement for a subsequent planned transaction in which a company called Lone Cypress LLC managed by Floyd would purchase the Trabelsi Shares from Plaintiff B2 (the "B2-Lone Cypress Agreement").

70.  In fact, the Lawyer Defendants prepared the B2-Lone Cypress Agreement to be dated effective February 9, 2016, the day after the closing on the SP Agreement appeared to occur (although subject to the fraud, deficiencies, issues and claims described below).

71.  With respect to the SP Agreement, the Escrow Agreement, and the B2-Lone Cypress Agreement, the Lawyer Defendants did not:

(A) Advise Plaintiff B2 to obtain separate counsel to review the SP Agreement and the Escrow Agreement before signing them;

(B) provide any conflict disclosure notice or advisory to Plaintiff B2 with full and fair disclosure of the risks to Plaintiff B2 of the Lawyer Defendants' role in acting as the sole "lawyer for the deal" or "lawyer for the transaction" with a recent history of being counsel to Defendant Trabelsi and Znergy-Mazzal;

(C) provide any conflict disclosure notice or advisory to Plaintiff B2 with full and fair disclosure of the risks to Plaintiff B2 and Znergy-Mazzal of the risks to each of them due to the Lawyer Defendants being the sole lawyers drafting the SP Agreement, the Escrow Agreement and the B2-Lone Cypress Agreement for all the parties to those documents, including, without limitation, Plaintiff B2, Znergy-Mazzal, Defendant Trabelsi, the purported Shawn Telsi, Defendant Trabelsi as trustee of The Mazzal Trust, and Lone Cypress LLC;

(D) provide any conflict disclosure notice or advisory to Plaintiff B2 with full and fair disclosure of the risks to Plaintiff B2 and Znergy-Mazzal of the lack of any separate

counsel for each party in the closing of the stock sales pursuant to the terms of the SP

Agreement and the Escrow Agreement.

72.   The Lawyer Defendants included in Section 11 on the last page of the Escrow

Agreement a purported "waiver of "any actual, apparent or potential conflict of interest on the

part of Escrow Agent also acting as counsel for the Company", but this waiver did not: (a)

encompass the conflict of interest in having the Lawyer Defendants act and intend to act as

counsel for Defendant Trabelsi, individually and as trustee of The Mazzal Trust, and for Plaintiff

B2 and Lone Cypress LLC all in the course of negotiating and documenting the transactions

reflected in the SP Agreement, the Escrow Agreement and the B2-Lone Cypress Agreement, nor

(b) assert that the Lawyer Defendants were not also counsel for other Escrow Agreement parties.

73.   Moreover, even this attempted waiver was presented without full and fair

disclosure of the risks of the conflicting representation that had occurred and were about to

occur, nor with any advice to Plaintiff B2 and Znergy-Mazzal that they should have separate

counsel review the SP Agreement and to close the stock sales thereunder.

74.   Likewise, the Lawyer Defendants sought to limit their liability for negligence that

also could constitute legal malpractice in exculpation, release and indemnification clauses at

paragraphs 5.a and 5.d of the Escrow Agreement without any such disclosures and without any

advice to Plaintiff B2 or Znergy-Mazzal that either should obtain independent legal counsel to

review and negotiate the Escrow Agreement.

75.   Under Rule 1.8(h)(1) of both the Massachusetts and Utah Rules of Professional

Conduct, a lawyer is prohibited from making "an agreement prospectively limiting the lawyer's

liability to a client for malpractice unless the client is independently represented in making the

agreement." Neither Plaintiff B2 nor Znergy-Mazzal was independently represented in making the Escrow Agreement.

**F**. **The Stock Sale Fraud, and the Lawyer Defendants' Gross Negligence**

76.   In both the SP Agreement and the Escrow Agreement, the sum of $315,000 is identified as the "Escrow Funds".

77.   Section 1.2(f) of the SP Agreement further provides, in pertinent part, as follows:

"The Parties further understand, acknowledge, and agree that the Escrow Agent shall be instructed to release the Escrow Funds only upon receipt of all of the Trabelsi Shares, the Telsi Shares, and the Trust Shares (as discussed below), or upon being informed by the Company's Transfer Agent (VStock Transfer, LLC), that the Trabelsi Shares, the Telsi Shares, and the Trust Shares have been returned to the Transfer Agent for transfer to the Buyer or for other disposition as instructed by the Buyer."

78.   Similarly, Section 2 of the Escrow Agreement provides, in pertinent part as follows:

"The Escrow Agent [Defendant Kirton] is authorized to disburse the Escrow Funds to the Selling Shareholders and to other named parties, as more fully set forth on Exhibit B, attached hereto and incorporated herein by this reference. The Parties further understand, acknowledge, and agree that the Escrow Agent shall be instructed to release the Escrow Funds only upon receipt of all of the Trabelsi Shares, the Telsi Shares, and the Trust Shares (as discussed below), or upon being informed by VStock Transfer, LLC, the Company's Transfer Agent (the "Transfer Agent"), that the Trabelsi Shares, the Telsi Shares, and the Trust Shares have been returned to the Transfer Agent for transfer to the Buyer or for other disposition as instructed by the Buyer."

79.   The SP Agreement was prepared and finalized by the Lawyer Defendants on or about February 4, 2016, and provides that the Final Stock Purchase Closing shall occur on February 5, 2016.

80.    The SP Agreement provided (on Exhibit B thereof, Amended Disbursement Instructions) that the entire Closing Payment Amount of $315,000 be paid to Defendant Trabelsi, with no allocation for the amount being paid for the 9,500,000 Free-Trading Telsi Shares and no

stated obligation of Trabelsi to pay any amount to "Shawn Telsi" for the Free-Trading Telsi Shares.

81.   On February 4, 2016, the Lawyer Defendants e-mailed to Defendant Trabelsi the forms to transfer the 45,800,000 Trabelsi Shares from Trabelsi to Plaintiff B2 and the 9,500,000 Free-Trading Telsi Shares from "Shawn Telsi" to the two designees directed by Plaintiff B2 (the designees were to hold the shares temporarily as security for certain financing repayment obligations of B2). True and correct copies of those forms are attached hereto as <u>Exhibit L</u>.

82.   In the February 4, 2016 e-mail to Defendant Trabelsi (which was copied to Peterson and Floyd), Defendant Lloyd wrote, "Nissim, Attached are the forms for you and Shawn to transfer all your shares. These will need to be medallion guaranteed and then sent to me or directly to VStock for the transfer to happen."

83.   However, based on all communications known to Plaintiff B2, during the negotiation, documentation, and closing of the transactions reflected in the SP Agreement and the Escrow Agreement, the Lawyer Defendants never had a direct communication with "Shawn Telsi" as a separate individual and therefore never verified whether he existed as a separate person, whether he had signed the SP Agreement and Escrow Agreement, whether he had approved the sale of the "Telsi Shares", or whether he had agreed that Defendant Trabelsi could receive payment for him.

84.   Indeed, in another February 4, 2016 e-mail to Defendant Trabelsi, of which the text forms part of <u>Exhibit E</u> hereto, the Lawyer Defendants wrote as follows: "Nissim, please confirm that it [the $315,000] is to be wired to your account and that you'll take care of payment to Shawn for his shares. I think I only have your wire instructions."

85. On February 4, 2016, Defendant Lloyd was aware that "Shawn's"

shares (the Free-Trading Telsi Shares) were the majority of the 12,000,000 Free-Trading

Shares of Znergy-Mazzal stock in existence and a material part of the transaction under

the SP Agreement, that he had had no direct contact with "Shawn Telsi" as a separate

individual with that name, and that the SP Agreement provided that the entire $315,000

would be wired to Defendant Trabelsi's account (as Defendant Trabelsi had instructed).

86.    Yet, the Lawyer Defendants chose to rely on Defendant Trabelsi to pay

"Shawn Telsi"- an alleged other individual- for his sale of the Free-Trading Telsi Shares,

while failing to provide any express obligation in the SP Agreement or the Escrow

Agreement for Trabelsi to do so and failing to verify with "Shawn Telsi" that payment in

full of the $315,000 cash consideration to Defendant Trabelsi alone was acceptable.

87.    On or about February 8, 2016, at approximately 8:06 a.m. Utah time,

Defendant Trabelsi sent an email to Defendant Lloyd, Joe Donohue at Defendant VStock,

and Peterson (a true and correct copy of which is included in the e-mail chain of which

Exhibit M hereto is a true and correct copy) confirming that Trabelsi had overnighted the

preceding Friday, February 5, 2016, to Mr. Donohue an envelope with 4 medallions,

listing:

> "1- transfer 9.5 million in stocks from interactive brokerage
>
>   2- transfer from Shawn to new member,
>
>   3-transfer from Shawn to new member,
>
>   4- transfer from Nissim Trabelsi to new member"

88.    Thus, by vague references and not attaching to the e-mail the actual documents that

he had sent, Defendant Trabelsi knowingly and intentionally made it appear to Plaintiff B2 that

he had sent the transfer forms for the 9,500,000 Free-Trading Telsi Shares to be transferred to

Plaintiff B2's two designees-Nancy Peterson and Travis Gutherie- and also had sent the documentation needed to transfer the 45,800,000 Trabelsi Shares to Plaintiff B2 or its designee.

89.  In reality, Defendant Trabelsi had sent only forms to transfer 9,500,000 shares of his 45,800,000 restricted Trabelsi Shares from his name into Shawn Telsi's name and then to transfer 7,000,000 of those restricted Trabelsi Shares to Nancy Peterson and 2,500,000 of those restricted Trabelsi shares to Travis Gutherie, Plaintiff B2's designees for the Free-Trading Telsi Shares.

90.  No one-whether Defendant Trabelsi, "Shawn Telsi", or anyone else- had sent Defendant VStock the complete paperwork necessary to transfer the 9,500,000 Free-Trading Telsi Shares to Plaintiff B2 or any designee of Plaintiff B2, nor any certificate representing the 9,500,000 Free-Trading Telsi Shares.

### G. Defendant VStock Participates in the Stock Sale Fraud and Cover-Up

91.  On or effective as of that preceding Friday, February 5, 2016, Defendant VStock had recorded Defendant Trabelsi's transfer of 9,500,000 of the restricted 45,800,000 "Trabelsi Shares" into the name of "Shawn Telsi" - to enable a subsequent transfer of 9,500,000 restricted shares from "Shawn Telsi" to Plaintiff B2 or its designees that would appear to be the 9,500,000 Free-Trading Telsi Shares.

92.  On February 8, 2016, at approximately 11:10 a.m. Utah time, Defendant Lloyd sent an email to Joseph Donohue of Defendant VStock Transfer (and to Peterson, Floyd and Trabelsi) worded as follows: "When you receive the package from Nissim, will you let me know if that's all you need to complete those transfers of the shares from Nissin (sic.) and Shawn Telsi and to cancel the shares owned by the Trust?".   Exhibit M hereto is a true and correct copy of an e-mail chain that includes that e-mail (with later forwarding information redacted).

93.  On that same day at approximately 3:31 p.m. Utah time, Defendant VStock through Joseph Donohue responded to that e-mail, stating in an e-mail to Defendant Lloyd, Peterson, Floyd and Defendant Trabelsi as follows:"I received the paperwork about a half hour ago and it appears we have all necessary paperwork to process now all we need is confirmation from Nissim to continue with the transaction".

94. Defendant VStock's representation of what it had received was vague and deceptive by not confirming specifically what documents it had received and by knowing and bad faith material omission.

95.  In fact, Defendant VStock had not received the paperwork necessary to transfer the 9,500,000 Free-Trading Telsi Shares to Plaintiff B2 or its designees, nor to transfer the 45,800,000 restricted Trabelsi Shares to Plaintiff B2.

96.  To the contrary, Defendant VStock was aware that it had transferred or was transferring 9,500,000 of the restricted Trabelsi Shares into the name of "Shawn Telsi" on or effective as of the preceding Friday, February 5, 2016, and that it had not received paperwork to transfer the 9,500,000 Free-Trading Telsi Shares to Plaintiff B2 or its designee.

97.  Defendant VStock knowingly and intentionally, in bad faith, or alternatively with extreme recklessness, gross negligence and conscious disregard of the truth, misrepresented what it had received from Defendant Trabelsi.

98.  Furthermore, Defendant VStock omitted to disclose to Defendant Lloyd and to Plaintiff B2 the material fact that Defendant VStock, on the preceding business day of Friday, February 5, 2016, had just processed a transaction in which the 9,500,000 of the Trabelsi Shares were transferred into the name of "Shawn Telsi" as the first transfer for and in cooperation with Defendant Trabelsi's scheme to make it appear, falsely, that 9,500,000 Free-Trading Telsi Shares

28

were being transferred as required under the SP Agreement (upon the following conveyance of those shares by "Shawn Telsi" to Plaintiff B2 or its designees).

99.   Exhibit N hereto is a true and correct copy of a page from a share transaction ledger prepared by Defendant VStock confirming the processing of that transaction.

100.   Defendant VStock had been chosen and engaged as Znergy-Mazzal's transfer agent and registrar by Defendant Trabelsi pursuant to a Transfer Agent and Registrar Agreement dated on or about May 20, 2014.

101. Defendant VStock also had been purporting to give advice on aspects of the transaction related to free-trading shares to Plaintiff B2, including, without limitation, in a Wednesday, February 3, 2016 e-mail sent by VStock's Director of Client Services, Shir Hochman to Peterson, a true and correct copy of which is attached hereto as Exhibit O.

102.  Defendant VStock was aware that the transaction for which it was providing stock transfer services included the transfer of free-trading shares to or as directed by Plaintiff B2.

103.  On February 8, 2016, Defendant VStock was aware that it had not received the forms from Defendant Trabelsi to transfer the Free-Trading Telsi Shares to or as directed by Plaintiff B2.

104.   Nevertheless, Defendant VStock misled Plaintiff B2 and Znergy-Mazzal, through Defendant VStock's communication to Defendant Park, about what forms Defendant VStock knew had been received from Defendant Trabelsi, both by misrepresentation and by material omission.

### H. The Lawyer Defendants' Conflicting Representation, Gross Negligence,  and Breach of Fiduciary Duty in Releasing The Escrow Funds

105.  Having authored the Escrow Agreement and the SP Agreement, the Lawyer Defendants were aware at all relevant times that the alternative prerequisites to

disbursement of the $315,000 escrow money by Defendant Kirton were Defendant Kirton's "receipt of all of the Trabelsi Shares, the Telsi Shares, and the Trust Shares (as discussed below), **or upon being informed by VStock Transfer, LLC, the Company's Transfer Agent (the "Transfer Agent"), that the Trabelsi Shares, the Telsi Shares, and the Trust Shares have been returned to the Transfer Agent for transfer to the Buyer or for other disposition as instructed by the Buyer."** (bolding supplied).

106.   Though having drafted and being aware of the conditions for release of the escrowed funds, the Lawyer Defendants did <u>not</u> include in their e-mail or other written communications with Defendant VStock (nor, on information and belief, any other communications):

(A) any request that Defendant VStock confirm that it had received the transfer documents prepared by Defendant Lloyd and e-mailed by him to Defendant Trabelsi on February 4, 2016, nor a scan and e-mail of those documents for comparison;

(B) any request that Defendant VStock scan and e-mail copies of the documents that Defendant VStock had received from Defendant Trabelsi on February 8, 2016 (so that the Lawyer Defendants could verify whether the conditions for release of the Escrow Funds were satisfied);

(C) any request that Defendant VStock e-mail a list of the documents that it had received from Defendant Trabelsi specifying the affected share certificate numbers and the number, transferor and transferee of the shares in the transfer forms that Defendant VStock had received;

(D) any request that Defendant Trabelsi e-mail a copy of the documents that he had sent to Defendant Vstock; or

(E) any request that Defendant Trabelsi provide a list of the documents that he had sent,

specifying the affected share certificate numbers and the number of shares, the

transferor and the recipient of the shares in the transfer forms that he had sent.

107.   Thus, the Lawyer Defendants were aware that:

(A) the only confirmation from Defendant VStock of what it had received was vague and did not specifically confirm receipt of the Trabelsi Shares, the Free-Trading Telsi Shares, and the Transferred Trust Shares as required by the Escrow Agreement and the SP Agreement for release of the $315,000 Escrow Funds;

(B) they had not seen the documents sent by Defendant Trabelsi to Defendant VStock and thus did not know whether the explicit condition to disbursement of the $315,000 Escrow Funds had been met; or even whether the transfer forms sent by the Lawyer Defendants to Defendant Trabelsi were the same forms that Defendant VStock had received from Defendant Trabelsi.

108.   Notwithstanding this awareness of what they did not know and had made no diligent effort to verify: (a) Defendant Lloyd represented, inaccurately, to Peterson of Plaintiff B2 that Defendant VStock had all of the documents to transfer the Trabelsi Shares and the Free-Trading Telsi Shares and to cancel the Transferred Trust Shares as required by the Escrow Agreement and that Peterson should authorize disbursement of the Escrow Funds to Defendant Trabelsi; and (b) the Lawyer Defendants caused the  disbursement of the entire $315,000 Escrow Funds to an account directed by Defendant Trabelsi, notwithstanding the lack of satisfaction of the Escrow Agreement and SP Agreement conditions for such disbursement.

109.  On February 8, 2016 at or about 4:10 p.m. Utah time, Defendant Trabelsi

confirmed by email to Joseph Donohue of VStock, and to Defendant Lloyd  that Defendant

Trabelsi had received the funds wired by the Lawyer Defendants to the account designated by

Defendant Trabelsi ("Hi Joe it looks like I received the funds please go ahead and complete all

transaction needed").  Exhibit M hereto includes a true and correct copy of that e-mail.

110.   The Lawyer Defendants caused that disbursement without having received

the signed SP Agreement and Escrow Agreement from Defendant Trabelsi;  Defendant Trabelsi

e-mailed those agreements to Defendant Lloyd at or about 5:24 p.m. Utah time, attached to an e-

mail of which a true and correct copy, as forwarded by Defendant Lloyd, is part of Exhibit E

hereto.

111.   Accordingly, the 9,500,000 shares in Znergy-Mazzal that were transferred to

Plaintiff B2's designees under SP Agreement § 1.2(e)(ii)) were restricted shares furtively carved

out of the Trabelsi Shares with Defendant VStock's transfer registration action rather than the

Free-Trading Telsi Shares that they were supposed to be.

112.   If the Lawyer Defendants had requested copies of the documents actually

received by VStock on February 8, 2016, they would have seen that the conditions to releasing

the $315,000 Escrow Funds not only had not been met, but that Defendant Trabelsi had not sent

the signed transfer forms provided by the Lawyer Defendants and was engaged in a subterfuge.

113.   Neither Defendant Trabelsi nor "Shawn Telsi" has ever signed and delivered to

Plaintiff B2 or the Lawyer Defendants the complete forms needed to transfer the 9,500,000 Free-

Trading Telsi Shares to or as directed by B2.

114.  Yet, on or about February 9, 2016, the Lawyer Defendants prepared and caused or

directed the filing of a Form 8-K with the SEC concerning the SP Agreement in which the following statement was made: "Mr. Telsi sold 9,500,000 shares of the Company's Common Stock."

115. Effective February 26, 2016, Defendant VStock recorded the transfer of the 9,500,000 restricted shares that were carved out of the Trabelsi Shares by the actions of Defendants Trabelsi and VStock, 7,000,000 to Nancy Peterson and 2,500,000 to Mr. Gutherie, as demonstrated on the share transaction register page prepared by Defendant VStock of which a true and correct copy is Exhibit N hereto.

116. Even as of February 26, 2016, Defendant Trabelsi had not delivered the signed paperwork to transfer even the remaining 36,300,000 Trabelsi Shares to Plaintiff B2 or its designee, let alone the Free-Trading Telsi Shares.

117. The Lawyer Defendants acted in clear violation of the requirements of the SP Agreement and the Escrow Agreement, and of their fiduciary duties as an escrow agent.

118. Without limitation on the preceding paragraph, the Lawyer Defendants released the Escrow Funds and allowed the full payment of $315,000 to be made to Trabelsi and, on information and belief, transferred the additional $10,000 to the themselves as legal fees and the $5,000 payment Defendant VStock Transfer, despite the facts that the conditions to disbursement of the funds provided by Plaintiff B2 had not been met, the seller's obligations under the SP Agreement had not been satisfied, and the Lawyer Defendants had taken no reasonably diligent steps to verify that such conditions and obligations had been met.

119. The Lawyer Defendants, as escrow agent, as counsel for Znergy-Mazzal, and as acknowledged lawyers "for the deal" or "for the transaction" during which they also had provided legal counsel to Plaintiff B2, continued for weeks to fail to ensure that the conditions

for release of the Escrow Funds were satisfied and that Plaintiff B2 or its designee received the Free-Trading Telsi Shares and 36,300,000 of the 45,800,000 Trabelsi Shares .

120.   Finally, on March 14, 2016, the Lawyer Defendants sent an e-mail to Defendant Trabelsi acknowledging that the Free-Trading Telsi Shares had not been transferred as required by the SP Agreement and that Defendant Lloyd had learned that fact from Peterson: "Nissim…Pete asked me to reach out to you about Shawn Telsi's shares.  From what Pete said, Shawn has not yet sent his shares by DWAC to the transfer agent. Will you ask him to do so right away?" A true and correct copy of that e-mail is attached hereto as Exhibit P.

121.   In that e-mail, Defendant Lloyd also stated,  "I can contact Shawn directly if that would be easier."

122.   The following day, the Lawyer Defendants sent an e-mail to an address earlier provided by Defendant Trabelsi as "Shawn Telsi's" e-mail address (a true and correct copy of which e-mail is Exhibit Q hereto), which, among other things, confirmed Defendant Lloyd's lack of prior contact of any kind with any separate individual named "Shawn Telsi": "Greetings! My name is Park Lloyd…".

123.    In that e-mail, the Lawyer Defendants requested that "Shawn Telsi" transfer "the 9,500,000 shares that you are holding in your account."

124.    In a March 18, 2016 email, Defendant Lloyd confirmed to Defendant VStock Defendant Lloyd's knowledge that the conditions for release of the Escrow Funds still had never been met: "Mr. Telsi held his shares in an account at Interactive Brokers. As I understand it, as of today, he had not transferred his shares from the IB account back to you".

125. On March 21, 2016, Defendant Lloyd received an email from Joseph Mele of VStock confirming, "It is correct that Mr. Telsi has not sent his shares from IB back to VStock".

126.   To date, Plaintiff B2 has never received any of the 9,500,000 Free-Trading "Telsi Shares" for which it paid with funds that the Lawyer Defendants improperly released from escrow despite the escrow requirements not having been met.

## I.   Defendant Trabelsi's Post-Closing Continuation of His Stock Fraud Scheme with Continuing Cover-Up by Defendant VStock

127.   In the course of communications with the Lawyer Defendants and Plaintiff B2 following the February 8, 2016 purported closing, Defendant Trabelsi created multiple, mutually inconsistent excuses for why the Free-Trading Telsi Shares were never transferred as required by the SP Agreement.

128.   In a phone conversation with Defendant Lloyd on or about March 31, 2016, Defendant Trabelsi asserted  that "Shawn Telsi" was separated/separating from his sister, which "made it harder for Nissim to get what we need from Shawn"   (as recounted on that date by Defendant Lloyd in an e-mail to Peterson and Floyd, of which Exhibit R is a true and correct copy).

129.   When Defendant Lloyd offered to call "Shawn" directly, Defendant Trabelsi said that "Shawn" had changed his phone number, e-mail and address, so even his sister did not know how to reach him (as Defendant Lloyd reported in his e-mail).

130.   In an email dated April 4, 2016, Defendant Lloyd confirmed that he did not know whether or not Trabelsi had paid "Shawn Telsi" for the Free-Trading Telsi Shares.

131.   This alleged issue would not have been possible, if Defendant Lloyd had performed his escrow agent and counsel duties competently and diligently by: (a) refusing to allow Defendant Trabelsi to receive the purchase money on a promise to pay "Shawn Telsi", with whom Defendant Lloyd had never had a conversation or any direct correspondence as of February 8, 2016 and (b) contacting "Shawn Telsi" directly by telephone, skype, viber, or other

voice communication medium and requiring written confirmation with photo proof of identity from "Shawn Telsi" that he authorized the Lawyer Defendants to disburse funds being paid for the Telsi Shares to Trabelsi.

132.   On or about April 11, 2016, Defendant VStock, through account representative Antoine Miles, sent an e-mail to Floyd, then President and CEO of Znergy-Mazzal, confirming that the shares needed to complete the transfers to Plaintiff B2 still had not been made available. Exhibit S hereto is a true and correct copy of an e-mail chain that includes that e-mail, in which VStock's Miles wrote,  "The transfer from Nissim Trabelsi to B-2 Opportunity Fund is still pending in our systems. If shares are not available to transfer by Wednesday this transaction will have to be rejected."

133. The April 11, 2016 VStock e-mail confirms the false and deceptive nature of the information contained in Joe Donohue's February 8, 2016 e-mail asserting the adequacy of the documents received from Defendant Trabelsi to consummate the contracted share transfers.

134.   On or about April 12, 2016, Defendant Trabelsi finally delivered the signed paperwork to Defendant VStock to transfer the remaining 36,300,000 of the total 45,800,000 restricted Trabelsi Shares to Lone Cypress LLC  as directed by Plaintiff B2, but not the paperwork needed to transfer the Free-Trading Telsi Shares.

135.   On or about April 20, 2016, Peterson sent an e-mail to Defendant Lloyd concerning a growing problem while the Free-Trading Telsi Shares remained under the control of Defendant Trabelsi, whether in his name or as "Shawn Telsi": the sale of a significant volume of free-trading shares into the marketplace and the adverse effect on Znergy-Mazzal's efforts to effectuate a capital raise from investors due to the instability of the stock price.

136.   In that e-mail, of which a true and correct copy of which is part of Exhibit T hereto,

Peterson wrote: "The time is now to get Shawn shares and I have attached a spreadsheet that shows the complete ownership and shareholders.  There has been over 1.8 million shares that have sold resulting in approximately 250,000 [dollars] plus to shawn and/orNissim (sic.)…"

137.   On or about April 21, 2016, Defendant Lloyd sent an e-mail to Peterson and to Floyd (a true and correct copy of which is part of <u>Exhibit T</u> hereto) confirming that he had spoken with Defendant Trabelsi twice and that Trabelsi had told him, among other things, that:

(A) He hadn't paid Shawn [Telsi] anything, and that Shawn owed Trabelsi some money;

(B) That he would find and forward to Defendant Park the e-mail from "Shawn" where Shawn sent Trabelsi the signed stock purchase agreement; and

(C) That in response to Defendant Lloyd's comment that Plaintiff B2 and Znergy-Mazzal did not want to bring a lawsuit, but that might be the next step, Defendant Trabelsi had responded "that might be what you would need to do."

138.   As these discussions were occurring, Defendant Trabelsi was exercising control (or at least shared control) over the Free-Trading Telsi Shares and directing that a material portion of them be sold into the OTC Market.

139.   As of February 8, 2016, the trading price for shares of Znergy-Mazzal had been approximately $0.04 to $0.045 per share.

140.   However, the market price of the shares predictably rose soon after the public announcement of the SP Agreement, including in the Form 8-K filed with the SEC on or about February 9, 2016.

141.   The trading price of free-trading shares of Znergy-Mazzal stock in the period

between February 17, 2016 and June 6, 2016, was between approximately $0.065 and $0.25 per share, and the average approximate sale price of the millions of shares that were sold into the marketplace after February 8, 2016 and up to June 7, 2016 was approximately $0.11 per share.

142. Znergy-Mazzal, under the management of Floyd as new CEO, worked on a private placement capital raise beginning in or about March 2016.

143. Znergy-Mazzal intended to raise $2.5 million with a convertible debenture at 10% per annum interest.

144. The conversion price was set at $0.25 per share with 100% warrant coverage at a $0.25 per share strike price.

145. Several investors were interested in such a potential investment, but the stock price fluctuated significantly;  Defendant Trabelsi, whether as "Shawn Telsi" or through the name of some other alleged beneficial holder of the publicly tradeable shares, was selling or causing to be sold millions of shares of Znergy-Mazzal stock to purchasers through the OTC Market, including without limitation portions of the Free-Trading Telsi Shares for which Plaintiff B2 had already paid.

146.    Between February 9, 2016 and August 24, 2016, 5,428,220 shares of Znergy-Mazzal stock were traded in the OTC Market (based on records available to Plaintiffs).

147.    The net proceeds of the sales of such 5,428,220 shares totaled approximately $549,418, based on calculations using the pertinent trading day highs, or approximately $0.10 per share.

148.     Since (a) Defendant Trabelsi as "Shawn Telsi" had claimed to own the 9.5 million Free-Trading Telsi Shares, and (b) the S-1 Registration of the original 2 million free-trading shares held in street name showed Defendant Trabelsi individually and as trustee of The

Mazzal Trust owning a combined 1,978,000 shares, and (c) there are a total of 12,000,000 free-trading shares held in "street name" by Cede & Co., nearly all of the traded shares were sold by or at the direction of Defendant Trabelsi.

149.    Defendant Trabelsi, whether directly or as "Shawn Telsi" or, alternatively, for the benefit of and in cooperation and participation with his relative "Shawn Telsi" (if he is a separate person), has received, directly or through one or more other persons' names and trust or limited liability company entities, the very large majority of the sales proceeds from sales of free-trading shares of Znergy-Mazzal stock during the period February 9, 2016 through August 24, 2016.

150.    On information and belief,  at least the very large majority of that estimated $549,418 came from proceeds of the sale of Free-Trading Telsi Shares.

151.    Thus, most, if not all, of such sale proceeds properly belong to Plaintiff B2, because they represent portions of the Free-Trading Telsi Shares bought, paid for and owned by Plaintiff B2.

152.     In light of these facts, Znergy-Mazzal, acting honestly, had to inform the potential investors with whom it was speaking about the $0.25 per share pricing that there was a large block of shares being sold on a continuous basis that in large part should have been held by Plaintiff B2 or its designee and that pursuit of legal remedies was most likely required to remedy the situation.

153.     As a direct and proximate result of Defendant Trabelsi's actions in selling or directing the sale of millions of shares into the OTC Market, including a large portion of the Free-Trading Telsi Shares, Znergy-Mazzal was unable to be successful in raising capital and thus had to reduce the amount of capital sought and reduce the conversion price from $0.25 per share to $0.10 per share with 100% warrant coverage at a $0.15 per share strike price.

154.    However, Defendant Trabelsi, whether as "Shawn Telsi" or otherwise, has continued to sell or direct the sale of such a volume of shares through the OTC Market that he has kept the price of Znergy-Mazzal stock suppressed.

155.    Between August 29, 2016 and January 4, 2017, based on records available to Plaintiff B2, approximately 1,394,366 shares of Znergy-Mazzal's stock were traded in the OTC Market at prices ranging from $0.04 per share to $0.12 per share, resulting in estimated sale proceeds of approximately $100,427.00, an average sale price of $0.07 per share.

156.    As of January 4, 2017, the two most recent trades (on December 30, 2016 and January 4, 2017) were at approximately $0.04 per share.

157.    As the direct and proximate result of the stock fraud in which Defendant Trabelsi was paid for the 9,500,000 Free-Trading Telsi Shares and then refused to deliver them,  instead selling them or directing their sale into the OTC Market, Znergy-Mazzal has been unable to complete any successful capital raise.

158.    As Defendant Trabelsi has engineered sales of an apparently large portion of the 9,500,00 Free-Trading Telsi Shares that properly are the property of Plaintiff B2, Plaintiff B2 has attempted to recover those shares.

159.    On or about June 2, 2016, Plaintiff B2, through Peterson, called Joe Donohue at Defendant VStock and sent him an e-mail requesting scanned copies of the documents that he had received from Defendant Trabelsi ["Nissim"] on February 9, 2016 [sic.-should be February 8, 2016].  A true and correct copy of that email is part of the e-mail chain of which a true and correct copy is attached hereto as Exhibit U.

160.    In response to that e-mail, Defendant VStock, through Donohue, denied that any

"formal paperwork" had been received on that date ("just merely emailed instructions from him to us") but committed that he would "continue to look through our paperwork to see any and all relevant request paperwork we received regarding your transactions." Exhibit U hereto contains a true and correct copy of that response.

161.    Donohue's response denying receipt of any formal paperwork contradicted his February 8, 2016 e-mail to Plaintiff B2 and Defendant Lloyd confirming that he had "received the paperwork about a half hour ago and it appears that we have all necessary paperwork to process…"

162.    When Peterson responded by forwarding Donohue his above-quoted February 8, 2016 e-mail, stating "I found this email that show that you received the documents from Nissim", Donohue's response was notably different: "This [referring to an attached document] is what we received in regards to the transaction since this was a rejection all originals were mailed back to the address we received it from." Exhibit V hereto is a true and correct copy of that e-mail exchange.

163.  The document referenced by Donohue as "This" was a DWAC Withdrawal Form in which "Shawn Telsi" requested the withdrawal of 9,500,000 shares from his Interactive Brokers account U1444151 but to be transferred as a "gift" to "the current shareholder's account" -meaning Shawn Telsi again, as confirmed by the completion of the line entitled "New Name/Registration" with "Shawn Telsi".

164.    The DWAC withdrawal form did not request transfer of the Free-Trading Trabelsi Shares to Plaintiff B2 or to any designee of Plaintiff B2, and the address provided for "Shawn Telsi" was 73 Truman Road, Newton, MA, the same address that Defendant Trabelsi has used for numerous legal documents, as further specified in paragraph 5(C) above.

41

165.  On information and belief, Joe Donohue's statement that "since this was a rejection all originals were mailed back to the address we received it from" was a dodge to continue refusing to show Plaintiff B2 just what documents VStock had received from Defendant Trabelsi on February 8, 2016 regarding which Joe Donohue had written in his e-mail of that date that he had "received the paperwork" and that it appeared that they had "all necessary paperwork to process" the transaction.

166.  On information and belief, Defendant VStock was attempting to convince Plaintiff B2 to accept the notion that Defendant VStock, as a transfer agent, would not have kept any copies of documents received by it concerning a transaction involving an SEC reporting company for which it was transfer agent.

167.  Moreover, Joe Donohue's comment that "this was a rejection" was confirmation that Defendant VStock had not received all paperwork needed to complete the transaction, confirming the falsehood of his February 8, 2016 e-mail sent on Defendant VStock's behalf.

168.  On or about June 7, 2016, Plaintiff B2's counsel sent a demand letter to Defendant Trabelsi, a/k/a Shawn Telsi, at various of his claimed addresses and by e-mail. Exhibit W hereto is a true and correct copy of that demand letter.

170. Among other things, the June 7, 2016 letter demanded that Defendant Trabelsi immediately transfer and deliver to Plaintiff B2 "9.5 million free-trading shares as you, whether as Nissim Trabelsi or Shawn Telsi, agreed to sell to B2 or its designees under the SPA [the SP Agreement] and for which you have already been paid."

171.  In the alternative, the June 7, 2016 demand letter demanded that Defendant Trabelsi transfer such of the "Telsi Shares" (the 9,500,000 Free-Trading Telsi Shares) as had not been sold into the market and pay to Plaintiff B2 all proceeds of all sales of any free-trading

shares of Znergy-Mazzal stock that he had made, regardless of the name in which he had directed or made those sales.

172.   In a June 16, 2016 e-mail (of which Exhibit X is a true and correct copy), Defendant Trabelsi took a new position on why the 9,500,000 Telsi Shares had not been transferred as required by the SP Agreement, contradicting his own transmission of the SP Agreement with Shawn Telsi's alleged electronic signature to Defendant Lloyd and his willing receipt of the $315,000 for the closing under the SP Agreement, averring that:

(A) He did not know and understand what Pete Peterson was talking about;

(B) By forwarding an e-mail allegedly from "Shawn Telsi" (from shawntelsi@msn.com to nissimtrabelsi@msn.com), that Telsi was "never part of any negotiation regarding the company [Znergy-Mazzal] and "never signed for any documents" and that "looking at the signature page it looks like my name was typed and converted to script, that's all"; and

(C)  That the SP Agreement was not a valid signed agreement, by stating, "We have this initial agreement attached with original signature (apparently referring to the October 26, 2015 Global Stock Exchange Agreement]. Then we have three e-mail agreements with no original signatures."

173.  Defendant Trabelsi's response, with its alleged forwarded Telsi e-mail, was false, deceitful, and fraudulent in multiple respects and was a continuation of his fraudulent scheme to be paid for the Free-Trading Telsi Shares pursuant to the SP Agreement and then refuse to deliver them (so that he could sell them again into the OTC Market) by blaming "Shawn Telsi's" actions, as demonstrated by, *inter alia*, the following facts:

A) Defendant Trabelsi himself had forwarded the SP Agreement and the Escrow Agreement to Defendant Lloyd and to Peterson by e-mail on February 8, 2016, with the electronic signature of "Shawn Telsi" (and thus, if that signature was fraudulent and unauthorized, it was Defendant Trabelsi who committed the fraudulent act);

B) The story is inconsistent with Defendant Trabelsi's assurance to Defendant Lloyd that Defendant Trabelsi had authority to receive the full payment and to remit "Shawn Telsi's" part to him;

C) The story is inconsistent with Defendant Trabelsi's April 20, 2016 commitment to Defendant Lloyd, reflected in the latter's April 21, 2016 e-mail (Exhibit T), to find and forward the e-mail in which Shawn Telsi sent the signed SP Agreement to Trabelsi;

D) Defendant Trabelsi still pretended to close on the transaction and received the full net cash consideration of $315,000 in the SP Agreement, without mentioning that he did not have the Free-Trading Telsi Shares or authority to sell them and would not deliver transfer documents for them;

E) The DWAC form presented to VStock regarding the 9,500,000 Free-Trading Telsi Shares on or about February 5, 2016 referenced all 9,500,000 shares in "Shawn Telsi's" account, which is  inconsistent with the alleged Shawn Telsi e-mail explanation of having sold 2.2 million shares and then half of the remaining shares after splitting with his wife (3.65 million shares) at $0.02 per share for $80,000; and

F) The stock sale history shows that the sales of approximately 5,428,220 shares of free-trading stock, between February 9, 2016 and August 24, 2016, were made at an average price of approximately $0.10 per share, not $0.02 per share.

174.  Additionally, "Shawn Telsi" noted that he "just get back to Israel" and would

have to be paid for his travel expenses to come to Boston to testify

175.  On or about June 20, 2016, Plaintiff B2's counsel responded to Defendant Trabelsi's e-mail, pointing out certain obvious falsehoods and inconsistencies therein.

176.  The June 20, 2016 renewed demand letter on behalf of Plaintiff B2, a true and correct copy of which is Exhibit Y hereto, noted, "Therefore, on behalf of B2, demand is renewed for the transfer of 9,500,000 free-trading shares to B2 or its designees as required by the SPA concerning the 9,500,000 "Telsi Shares"."

177. On or about June 20, 2016, Defendant Trabelsi sent Peterson, Managing Member of Plaintiff B2, two texts reading as follows:

First Text Message:

"Peter I just got a telephone call from my sister  She noticed there is no volume on the stock and I ask her not to sell.   I think she have 3.8 million shares she can transfer to you for a discount price of .05.  Please let me know if you interesting"

Second Text Message:

"Peter I think she also is talking to couple investors

But I told her to hold on until I will speak to you"

178. Since the Free-Trading Telsi Shares comprised 9.5 million of the 12.0 million freely tradeable shares, Trabelsi's claim that his sister had 3.8 million shares meant, at a minimum, that a significant portion, if not all, of the 3.8 million shares were among the 9.5 million Free-Trading Telsi Shares that Defendant Trabelsi already had contracted to sell to Plaintiff B2 in the name of "Shawn Telsi" and for which Defendant Trabelsi already had received full payment.

179.  Additionally, Trabelsi's statement that 3.8 million shares were held by his sister necessarily meant that Defendant Trabelsi was further effectuating his fraudulent scheme

in one of the following ways:   (i) Defendant Trabelsi  intended to have 3.8 million of the Free-Trading Telsi Shares transferred into his sister's name before transferring them to Plaintiff B2, in order to make it appear that he had no control over the Free-Trading Telsi Shares and that he was "helping" Plaintiff B2; or (ii) that a significant part of what Defendant Trabelsi as Shawn Telsi, or, alternatively, Shawn Telsi as an individual, had agreed to sell as the Free-Trading Telsi Shares in the SP Agreement had not been owned or held in the name "Shawn Telsi" at the time that the SP Agreement was delivered to Defendant Lloyd with purported signatures by Defendant Trabelsi and "Shawn Telsi", or (iii) after having sold the Free-Trading Telsi Shares to Plaintiff B2 under the SP Agreement, Defendant Trabelsi as "Shawn Telsi" had then transferred beneficial ownership of them with the street name holder or in a brokerage account to his sister.

180. On information and belief, Defendant Trabelsi had delivered the DWAC request on or about February 5, 2016 to transfer the 9,500,000 Free-Trading Telsi Shares from "Shawn Telsi" to "Shawn Telsi" in order to move away from the broker or the account with the broker of which Defendant Trabelsi believed Plaintiff B2 was aware or could become aware through interactions with Defendant VStock.

181. Regardless of which approach Defendant Trabelsi intended, he was trying to sell to Plaintiff B2 for a second time 3.8 million shares that B2 already had bought.

### J. Defendant Trabelsi's Fraudulent Transfer of the Property in Taunton, Massachusetts

182.  Having initially succeeded in being paid for the Free-Trading Telsi Shares and then having sold or caused the sale of a portion of them a second time, while retaining the unsold portion, Defendant Trabelsi next committed fraudulent acts to transfer the Property from Znergy-Mazzal, knowing that he, Trabelsi, had perpetrated a fraud in the SP Agreement.

183.  On or about November 10, 2015, after the close of the October 26, 2015 stock

exchange agreement with Global ITS but unbeknownst to Plaintiff B2 (or to Floyd as an officer of Znergy-Mazzal) until recently, Defendant Trabelsi caused the formation of "Mazzal Holding Corp." as a Massachusetts corporation with the same name as Znergy-Mazzal at that time and then deceptively used that Massachusetts corporation's name to sign and cause the filing of a deed on its behalf to transfer record title to the Property that was actually owned by Znergy-Mazzal (then also called "Mazzal Holding Corp.", but a Nevada corporation).

184. On or about August 8, 2016, unbeknownst to Plaintiff B2 or Znergy-Mazzal until recently, Defendant Trabelsi signed a deed transferring the Property to The Bany's Living Trust and then, with his wife, Aliza Trabelsi, documented the establishment of the recipient, The Bany's Living Trust, with themselves as trustees by Declaration of Trust dated August 15, 2016. Exhibit A hereto is a true and correct copy of the deed as filed in the Bristol County records (the "Fake Deed"), and Exhibit D hereto is a true and correct copy of the Declaration of Trust as filed in the Norfolk County records.

185. Defendant Trabelsi, as a person who focuses on real estate deals, knew that any uninformed person researching the chain of title would see a transfer into a Mazzal Holding Corp. on November 21, 2013 and then a transfer from "Mazzal Holding Corp." to The Bany's Living Trust, giving the appearance of an uninterrupted chain of title to the Property.

186. In order to deceive and misdirect Plaintiff B2 and Znergy-Mazzal, and anyone else trying to determine if Defendants Trabelsi and Aliza Trabelsi had received the fraudulent transfer or were involved with The Bany's Living Trust, they caused the placement of another person's name and return address on the deed-namely, David Uliel, 50 Magnolia Road, Natick, MA and filed the Declaration of Trust in Norfolk County rather than Bristol County, where the Property is located and where the Fake Deed was filed.

187.   On information and belief, in light of the Trust Declaration's identification of Defendant Trabelsi and Defendant Aliza Trabelsi as the trustees and primary beneficiaries, and their children as the second or contingent beneficiaries, The Bany's Living Trust is the family trust vehicle through which Defendants Trabelsi and Aliza Trabelsi intend to enjoy and benefit from the fraudulent transactions in which Defendant Trabelsi has engaged.

188.   Indeed, on or about September 30, 2016, unbeknownst to Plaintiff B2 or Znergy-Mazzal until recently, a mortgage was filed securing a loan of $1.3 million from The Bany's Living Trust to Magnolia Road LLC, a limited liability company controlled by Defendant Trabelsi that owns a property known as 50 Magnolia Road, Natick, which in turn contains a very large house and is undergoing further development.  Exhibit Z hereto is a true and correct copy of that mortgage as found in the Registry of Deeds for Middlesex County.

189.   Defendant Trabelsi formed Magnolia Road LLC on or about December 8, 2015, and, at relevant times, he has been its sole Manager and designated person who can execute or record recordable instruments purporting to affect interests in real property in the records of the Secretary of the Commonwealth.  The address of 50 Magnolia Road is the same address that was listed for a return of the Fake Deed, although shown with the name David Ulliel.

190.   On information and belief, a material portion of the funds loaned by The Bany's Living Trust to Magnolia Road LLC as reflected in the September 30, 2016 mortgage were proceeds of sales of portions of the Free-Trading Telsi Shares; prior to the closing on the SP Agreement, Defendant Trabelsi had told Peterson that he did not have the funds to pay or to provide Znergy-Mazzal to pay the $10,000 to Defendant Kirton and the $5,000 to Defendant VStock that Plaintiff B2 ultimately agreed to pay in connection with closing the share sales described in the SP Agreement.

191.   There is a substantial and immediate risk of irreparable harm to Plaintiff B2 and Znergy-Mazzal – including, without limitation, of the concealment or dissipation of assets that Plaintiff B2, directly or as assignee of Znergy-Mazzal, is entitled to recover- unless Plaintiff B2, directly and as assignee of Znergy-Mazzal, is granted injunctive and other equitable relief sought herein against Defendants Trabelsi, individually and as trustee of The Mazzal Trust and The Bany's Living Trust, Aliza Trabelsi, individually and as trustee of The Bany's Living Trust, and Defendant Trabelsi's controlled companies, including without limitation Defendants Massachusetts Mazzal and Magnolia Road LLC.

## V.  CAUSES OF ACTION

192.    If and to the extent that any causes of action in this Complaint are inconsistent with one or more other causes of action in this Complaint, they are pled in the alternative.

### COUNT I:

**Federal Rule 10b-5 Securities Fraud Claim by Plaintiff B2
Against Defendants Trabelsi and VStock**

193.   Plaintiff B2 re-alleges and incorporates paragraphs 1 through 192 above as if fully restated in this Count.

194.    In connection with a purchase or sale of securities, specifically shares of the common stock of Znergy-Mazzal that the SP Agreement required be sold and transferred to Plaintiff B2 or its designee(s), Defendant Trabelsi, individually and as "Shawn Telsi" and as trustee of The Mazzal Trust,  committed fraud on Plaintiff B2, by, *inter alia*, making the following material misrepresentations and untrue statements of material fact to the other parties to the SP Agreement, including Plaintiff B2 and Znergy-Mazzal:

(A)    In the SP Agreement effective February 4, 2016 that he e-mailed on February 8, 2016, Defendant Trabelsi knowingly misrepresented that he intended, in his name and in the

alias and alter ego name "Shawn Telsi", to (i) sell and transfer both the 45,800,000 restricted Trabelsi Shares and the 9,500,000 Free-Trading Telsi Shares, respectively, to Plaintiff B2 or its designees, as stated in paragraph 1.1 of the SP Agreement, and (ii) instruct the transfer agent to transfer all the 9,500,000 Free-Trading Telsi Shares to Plaintiff B2 or its designee(s), with all necessary documents and assurances in order to permit registration of the transfer thereof on the books of the Company [Znergy-Mazzal], when in fact he had no intention of selling and transferring the Free-Trading Telsi Shares under the SP Agreement and had already arranged for Defendant VStock to transfer 9,500,000 of his restricted Trabelsi Shares into the name of Shawn Telsi for later transfer and delivery to Plaintiff B2's designees in order to mislead Plaintiff B2 into believing that the 9,500,000 Free-Trading Telsi Shares had been transferred; and

(B)     In the SP Agreement with the purported electronic signature of Shawn Telsi, Defendant Trabelsi knowingly misrepresented that "Shawn Telsi" was a separate individual who signed and agreed to sell and direct the transfer agent to transfer his 9,500,000 Free-Trading Telsi Shares under the SP Agreement, when in fact "Shawn Telsi" was merely another name used by Defendant Trabelsi in real estate transactions and in the SP Agreement;

(C)     By including the name "Shawn Telsi" as the seller of the 9,500,000 Free-Trading Telsi Shares in the SP Agreement, Defendant Trabelsi knowingly misrepresented the existence of a separate signatory and party, so that he could blame that alleged party for his intentional and planned refusal to transfer the Free-Trading Telsi Shares to Plaintiff B2 or its designees after having received payment in full for the sale and transfer of the Free-Trading Telsi Shares; or

(D)     In the alternative to subparagraphs (A)- (C) immediately above, if Shawn Telsi were a real and separate individual and the e-mail that he forwarded dated June 16, 2016, Exhibit X hereto, is from a real Shawn Telsi confirming accurately that he was never part of a

50

negotiation and never signed any documents, then Defendant Trabelsi intentionally

misrepresented that Shawn Telsi had electronically signed the SP Agreement and Escrow

Agreement and authorized the transactions in them by e-mailing those documents with "Shawn

Telsi's" purported electronic signatures on or about February 8, 2016 (part of Exhibit E hereto);

(E)    In the alternative to subparagraphs (A)-(C) immediately above, if the June 16,

2016 e-mail allegedly from Shawn Telsi (Exhibit X hereto) were genuine and if the facts about

Shawn Telsi's alleged prior sales of the 9,500,000 Free-Trading Telsi Shares were true, then by

sending the SP Agreement with Shawn Telsi's alleged signature, Defendant Trabelsi was

knowingly misrepresenting (or misrepresenting in conscious and reckless disregard of the truth)

that all of the Free-Trading Telsi Shares were available to be sold to Plaintiff B2 or its designees;

(F)    In Defendant Trabelsi's February 8, 2016, 8:06 a.m. e-mail to Defendants VStock,

the Lawyer Defendants and Plaintiff B2 (pages 3 and 4 of Exhibit M hereto), Defendant Trabelsi

knowingly misrepresented (by the e-mail's content and the context of the requirements of the SP

Agreement, and Defendant Lloyd's prior transmission of the transfer forms needed to transfer the

9,500,000 Free-Trading Telsi Shares and the Trabelsi Shares) that he had sent to Defendant

VStock the documents necessary to transfer the Trabelsi Shares and the Free-Trading Telsi

Shares as required by the SP Agreement, when in fact: (i) he had not sent the documents needed

to transfer the 9,500,000 Free-Trading Telsi Shares to Plaintiff B2 or its designee(s) (and, to the

contrary, had sent the DWAC Form dated February 5, 2016 to transfer the Free-Trading Telsi

Shares from the Interactive Brokerage account into the same Shawn Telsi's name again), and (ii)

on or about February 5, 2016, he had sent a form for the carve-out of 9,500,000 shares of his

restricted Trabelsi Shares to be transferred into Shawn Telsi's name and then subsequently into

Plaintiff B2' designees' names to give the misleading appearance that the Free-Trading Telsi

Shares had been transferred per the SP Agreement and (iii) he had failed to deliver to Defendant VStock the documents necessary to transfer the remaining 36,300,000 of the Trabelsi Shares to Plaintiff B2 or its designee;

(G)     In the SP Agreement, Defendant Trabelsi knowingly misrepresented the contact address for himself and Znergy-Mazzal as 1625 VFW Parkway, Boston, MA 02132, when he knew that such address was a vacant lot and that notices could not be delivered (and summonses could not be served) there;

(H)     Defendant Trabelsi misrepresented on or about April 21, 2016 through the Lawyer Defendants as Escrow Agent and legal counsel for the transaction that he would find and forward the e-mail "where Shawn Telsi sent [Trabelsi] the signed stock purchase agreement", as reflected in Defendant Lloyd's April 21, 2016 e-mail to Peterson and Floyd of which Exhibit T includes a true and correct copy, while knowing that no such e-mail from Shawn Telsi existed, because either: (i) Defendant Trabelsi was using the name "Shawn Telsi" as his own alias and alter ego, or (ii) if Shawn Telsi were a separate person who sent the June 16, 2016 e-mail to Defendant Trabelsi and stated the truth therein, then Shawn Telsi never e-mailed a signed SP Agreement to Defendant Trabelsi; and

(I)     Defendant Trabelsi made the misrepresentations about his sister having 3.8 million shares that she could sell to Plaintiff B2 in his June 20, 2016 text messages, as if those 3.8 million shares were completely separate from the Free-Trading Telsi Shares, as further described in paragraphs 177-179 above.

195.  Each of the misrepresentations described in paragraph 194(A)-(I) above was made by Defendant Trabelsi (acting in his own name, in the name of "Shawn Telsi" and as trustee of The Mazzal Trust) knowingly and with a conscious intent to mislead and defraud Plaintiff B2,

or, alternatively, was made with a high degree of recklessness and danger of misleading Plaintiff B2 in a manner known to Defendant Trabelsi or so obvious that he must have been aware of it. Plaintiff B2 reasonably relied on Defendant Trabelsi's misrepresentations of material fact to Plaintiff B2's detriment.

196. In connection with a purchase or sale of securities, specifically the sale of shares of stock in Znergy-Mazzal required by the SP Agreement, Defendant Trabelsi committed fraud by material omission, when he failed to disclose material facts to Plaintiff B2 (and to Znergy-Mazzal through its new management, Floyd) that any reasonable purchaser would have considered important to know in making the decision to proceed with the purchase under the SP Agreement, including without limitation:

A)  That when he delivered the SP Agreement bearing the signatures of himself and "Shawn Telsi" on or about February 8, 2016, and when he received the purchase proceeds for all of the Trabelsi Shares and the Free-Trading Telsi Shares, Defendant Trabelsi had no intention of complying with the SP Agreement's requirement to sell and transfer the 9,500,000 Free-Trading Telsi Shares to Plaintiff B2 or its designee(s), nor of complying with the SP Agreement requirement that Trabelsi and "Shawn Telsi" sell and transfer to Plaintiff B2 or its designee(s) 45,800,000 shares held in the name of Nissim Trabelsi plus 9,500,000 Free-Trading Telsi Shares held in the name of Shawn Telsi.

B)  That when he sent his February 8, 2016, 4:08 p.m. e-mail confirming to Plaintiff B2 (through the Lawyer Defendants as Escrow Agent and legal counsel for the transaction) that he had received the purchase funds and the transaction could proceed, he knew that in fact the transaction would not proceed to conclusion with the required transfers totaling 55,300,000 shares of Znergy-Mazzal stock in the aggregate from Defendant Trabelsi and "Shawn Telsi" to

Plaintiff B2 or its designees and that he was not delivering to Defendant VStock the documents needed to effectuate those transfers as required by the SP Agreement;

C)   That, contrary to the express terms of the SP Agreement when he placed the electronic signatures of himself and "Shawn Telsi" on it, Defendant Trabelsi intended to retain control of the 9,500,000 Free-Trading Telsi Shares so that he could capitalize on the value that would be generated by the additional expenditures being made and business activities being undertaken by Znergy-Mazzal with assistance from Plaintiff B2- including, without limitation, by selling some or all of the Free-Trading Telsi Shares that Plaintiff B2 had already purchased for cash already paid;

D)   That no later than February 5, 2016, Defendant Trabelsi had sent to Defendant VStock paperwork to transfer 9,500,000 of his 45,800,000 restricted Trabelsi Shares into the name of "Shawn Telsi"  and that Defendant VStock had processed or was processing that transfer on or effective as of February 5, 2016, a maneuver intended to deceive Plaintiff B2 into believing that the 9,500,000 shares that next would be transferred from "Shawn Telsi" to Plaintiff B2's designees were the 9,500,000 Free-Trading Telsi Shares;

E)   That on or about February 5, 2016, Defendant Trabelsi had delivered to Defendant VStock a DWAC Withdrawal Form to pull the Free-Trading Telsi Shares out of the Interactive Brokerage account in which they had been held but to keep the record owner's name as "Shawn Telsi"-not to transfer them to Plaintiff B2 or its designee;  and

 F)   That "Shawn Telsi" was an alias and alter ego for Defendant Trabelsi himself that he was using to establish a false alleged excuse independent of Trabelsi's own actions to blame for his intentional failure to transfer the 9,500,000 Free-Trading Telsi Shares after receiving payment for them; or

G)  In the alternative to the immediately preceding subparagraph (F), if "Shawn Telsi" were a separate individual (notwithstanding Defendant Trabelsi's deed filings asserting his identity as Shawn Telsi), that Defendant Trabelsi had placed the purported electronic signature of Shawn Telsi on the SP Agreement without Shawn Telsi's knowledge and without Shawn Telsi's agreement with the transactions required by the SP Agreement.

197.  Each of the above omissions to state a material fact was committed by Defendant Trabelsi knowingly, with a conscious intent to mislead and defraud Plaintiff B2, or, alternatively, was made with a high degree of recklessness and danger of misleading Plaintiff B2 in a manner known to Defendant Trabelsi or so obvious that he must have been aware of it.

198.  Plaintiff B2 reasonably relied to its detriment on the affirmative, material misrepresentations made by Defendant Trabelsi and on the non-existence of the material facts omitted by Defendant Trabelsi described in the preceding paragraphs.

199.  Defendant VStock Transfer (which Defendant Trabelsi had chosen as Plaintiff Znergy-Mazzal's transfer agent) actively participated in, furthered and committed part of the fraud on Plaintiff B2 committed by Defendant Trabelsi.

200.  Through the February 8, 2016 e-mail communication (pages 1-2 of Exhibit M) of its employee, Joseph Donohue ("Donohue"), acting within the course and scope of his employment, Defendant VStock made the material misrepresentation and untrue statement of material fact to the Lawyer Defendants, who were acting as Escrow Agent for the SP Agreement parties (including without limitation Plaintiff B2 and Znergy-Mazzal) and as counsel "for the transaction" in closing the SP Agreement transaction, that "it appears we have all necessary paperwork to process now all we need is confirmation from Nissim to continue with transaction."

201.  In reality, Defendant VStock had not received the paperwork necessary to transfer the Free-Trading Telsi Shares to Plaintiff B2 or its designee, nor the paperwork to transfer 36,300,000 of the 45,800,000 Trabelsi Shares to Plaintiff B2 or its designee.

202.  Defendant VStock's misrepresentation, through Donohue, about what it had received was made knowingly and with a conscious intent to defraud Plaintiff B2 (and Znergy-Mazzal) or, alternatively, was made with a high degree of recklessness and danger of misleading Plaintiff B2 (and Znergy-Mazzal), directly or through the Lawyer Defendants as Escrow Agent for Plaintiff B2 and Znergy-Mazzal,  in a manner known to Defendant VStock so obvious that it must have been aware of it; it was necessarily obvious to Donohue that he did not have the paperwork to accomplish the transfers of the Free-Trading Telsi Shares and of the majority of the Trabelsi Shares to Plaintiff B2 or its designees.

203.   Moreover, on February 8, 2016, Defendant VStock had actual knowledge that Defendant Trabelsi and "Shawn Telsi" already had submitted documentation inconsistent with the transfers to Plaintiff B2 of the 45,800,000 restricted Trabelsi Shares plus the 9,500,000 Free-Trading Telsi Shares, including the following:

(A)  Defendant VStock had received from Defendant Trabelsi a DWAC form dated February 5, 2016 (the attachment to Exhibit V hereto), purportedly from Shawn Telsi, requesting that 9,500,000 shares be transferred from his Interactive Brokerage account into his own name, not into the name of Plaintiff B2 or its designees; and

(B)  Defendant VStock had received a form for (and registered on or effective as of February 5, 2016) Defendant Trabelsi's transfer of 9,500,000 restricted shares being held in his name (and that were part of the 45,800,000 "Trabelsi Shares" that he had agreed to sell as Nissim Trabelsi to Plaintiff B2 in the SP Agreement) into the name of "Shawn Telsi" - for subsequent

transfer from the name "Shawn Telsi" to Plaintiff B2 or its designees (as shown on Exhibit N hereto). .

204.    Donohue's June 2, 2016 initial response (Exhibit U) to Peterson's inquiry about the documents received by Defendant VStock from Defendant Trabelsi, in which VStock's Donohue denied VStock's receipt of any "formal paperwork", contradicted his own false representation given to Plaintiff B2 and Defendant Lloyd on February 8, 2016 that he had "received the paperwork about a half hour ago and it appears that we have all necessary paperwork to process…"

205.  Only when Peterson responded by forwarding Donohue his above-quoted February 8, 2016 e-mail and requesting copies of the documents did Donohue acknowledge that there had been any documents received by Defendant VStock related to the B2 transaction, attaching the document referenced in paragraph 203(A) above (the attachment to Exhibit V hereto), and yet he still did not inform Plaintiff B2 of the document referenced in paragraph 203(B) above.

206.    On February 8, 2016 in Joe Donohue's e-mail, and in response to Plaintiff B2's inquiry on June 2, 2016, and at all times between those dates, Defendant VStock had omitted to inform Plaintiff B2 or the Lawyer Defendants (as Escrow Agent for Plaintiff B2 and Znergy-Mazzal and lawyer for the transaction) of the material fact that Defendant VStock had received a form for and was processing or had processed the transfer of 9,500,000 shares from the restricted Trabelsi Shares into the name of "Shawn Telsi" on or effective as of February 5, 2016.

207.    On February 8, 2016, Defendant VStock had omitted to inform Plaintiff B2 or the Lawyer Defendants of the material fact that VStock had received the February 5, 2016 DWAC form in which "Shawn Telsi" requested a transfer to himself of the 9,500,000 Free-Trading Telsi Shares, but no paperwork to transfer those shares to Plaintiff B2 or its designees.

208.   Plaintiff B2 reasonably relied on the alleged fact seemingly confirmed in Defendant VStock's February 8 2016 e-mail-that VStock had received the necessary paperwork to transfer the Trabelsi Shares and the Free-Trading Telsi Shares to Plaintiff B2 or its designees.

209.   Plaintiff B2 reasonably relied on the non-existence of the omitted facts referenced in paragraphs 203, 206 and 207 above in not affirmatively halting the SP Agreement transaction.

210.   Defendant VStock had a duty to disclose material facts to Plaintiff B2 that VStock knew would prevent it from registering the sale and transfer of the Free-Trading Telsi Shares to Plaintiff B2 or its designee due to at least five facts:

(A) Plaintiff B2 was the contracted buyer and transferee of the Free-Trading Telsi Shares;

(B)  Defendant VStock's direct communications (through Shir Hochman, Director of Client Services) with and provision of advice to Plaintiff B2's Peterson related to free-trading shares as the SP Agreement was being finalized (as demonstrated, *inter alia*, by Exhibit O hereto);

(C)  Defendant VStock agreed to process the transfer of the Trabelsi Shares and the Free-Trading Telsi Shares to Plaintiff B2 or its designees as shareholders;

(D) Defendant VStock, through Joe Donohue's February 8, 2016 e-mail, made affirmative representations about its receipt of the necessary share transfer paperwork to accomplish the transaction on which it knew Plaintiff B2 foreseeably would rely in connection with authorizing a release of the purchase money from escrow; and

(E)  Plaintiff B2 was an intended and known beneficiary of Defendant VStock's performance of services under its Transfer Agent and Registrar Agreement with Znergy-Mazzal related to the B2 transaction.

211.   Defendant VStock's omissions were material and done knowingly and with a

conscious intent to defraud Plaintiff B2 or, in the alternative, were made with a high degree of recklessness, constituting an extreme departure from the standards of ordinary care and presenting a danger of misleading Plaintiff B2 that was either known to Defendant VStock, through Donohue or otherwise, or so obvious that Defendant VStock must have been aware of the omitted material facts.

212.   Defendants Trabelsi (individually, in his own name and the name of Shawn Telsi, and as trustee of The Mazzal Trust) and VStock, acting intentionally and knowingly, or alternatively with a high degree of recklessness, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) have employed or are employing devices, schemes, or artifices to defraud Plaintiff B2; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material fact(s) necessary to make the statements made not misleading to Plaintiff B2 as purchaser; or (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit on Plaintiff B2 or its designees.

213.   Defendant VStock has respondeat superior liability to Plaintiff B2 for the acts and omissions of VStock's officers, directors and employees, including without limitation Joseph Donohue and Shir Hochman.

214.   By engaging in the conduct described above, Defendants Trabelsi (individually, using the name "Shawn Telsi" and as the trustee of The Mazzal Trust), and VStock have violated, and unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

215.   As a direct and foreseeable result of the fraudulent misrepresentations, material omissions, and acts perpetrated by Defendants Trabelsi (individually, using the name "Shawn Telsi" and as the trustee of The Mazzal Trust) and VStock:

  (A) Plaintiff B2 paid in full for the Free-Trading Telsi Shares but never received them, and Trabelsi has retained control over and has sold or directed and, on information and belief, continues to sell or direct the sales of portions of the Free-Trading Telsi Shares into the OTC Market and has retained the proceeds of such sales for his personal gain, directly or through one or more of his alter egos, family members' names or controlled entities; and

  (B)  Plaintiff B2 has suffered economic damages as the direct, foreseeable and proximate result of the fraudulent misrepresentations, material omissions, and acts constituting the employment of devices, schemes, or artifices to defraud, and acts, practices or courses of business by Defendants Trabelsi and VStock which operated and operate as a fraud or deceit upon Plaintiff B2.

216.   Plaintiff B2 hereby sues Defendants Trabelsi and VStock for securities fraud in violation of the U.S. Securities Exchange Act of 1934, Section 10(b), and Rule 10b-5 thereunder, and for all recoverable damages caused by such fraud.

### COUNT II:
### Plaintiff B2's Common Law Fraud Claim Against
### Defendants Trabelsi and VStock

217.   Paragraphs 1 through 216 of this Complaint are incorporated by reference as if fully restated in this Count II.

218.   Defendants Trabelsi (individually and using the name "Shawn Telsi" and as trustee of The Mazzal Trust) and VStock each, knowingly and intentionally, or, in the alternative, in conscious and reckless disregard for the truth:

(A)  made misrepresentations of material fact to Plaintiff B2, directly and by making them to the Lawyer Defendants, and Plaintiff B2 reasonably relied thereon to its detriment; and

(B)  knowingly and intentionally, or, in the alternative, in conscious and reckless disregard for the truth, omitted to state material facts to Plaintiff B2 that were necessary to make the statements made by or on behalf of Defendant Trabelsi and VStock not misleading, and Plaintiff B2 reasonably relied on the absence of such omitted facts to its detriment.

219.   The material misrepresentations made by Defendants Trabelsi and VStock to Plaintiff B2, and the material facts that Defendants Trabelsi and VStock omitted to state to Plaintiff B2, include, without limitation, those specified in Count I of this Complaint.

220.   As a direct, foreseeable and proximate result of the material misrepresentations and omissions to state material facts committed by Defendants Trabelsi and VStock, Plaintiff B2 suffered damages and hereby sues Defendants Trabelsi (individually, as "Shawn Telsi" and as trustee of The Mazzal Trust) and VStock for common law fraud and for all recoverable damages caused by such fraud.

## COUNT III:

**Plaintiff B2, Assignee's Request for Declaratory Judgment Against Defendants Trabelsi, Individually and as Trustee, Aliza Trabelsi, Individually and as Trustee, and Massachusetts Mazzal**

221.   Paragraphs 1 through 220 of this Complaint are incorporated by reference as if fully restated in this Count.

222.   On or about November 10, 2015, Defendant Trabelsi organized or caused the organization of Massachusetts Mazzal with the same name as Plaintiff Znergy-Mazzal at that time ("Mazzal Holding Corp.").

223.  Defendant Trabelsi signed the Fake Deed (of which <u>Exhibit A</u> is a true and correct copy as obtained electronically from the Bristol County Registry of Deeds) as Secretary of Massachusetts Mazzal and caused it to be filed, transferring record title to the Property to his family trust, The Bany's Living Trust, while knowing that: (a) he did not have any legal authority from or position in Znergy-Mazzal, the true owner of the Property, in August 2016 to sign any deed transferring the Property; and (b) the Free-Trading Telsi Shares- a highly material portion of the shares required to be transferred under the SP Agreement- had not been transferred per the SP Agreement, notwithstanding payment therefor, and that Plaintiff B2 had been asserting a claim for those shares.

224.  Znergy-Mazzal, not Massachusetts Mazzal, was the Property's legal owner at the time the Fake Deed was filed.

225.  Defendant Massachusetts Mazzal did not exist when Znergy-Mazzal received title to the Property, which was in 2013.

226.   Defendant Trabelsi knew that he could not legally transfer title to the Property after he had resigned all of his officer and director positions with Znergy-Mazzal in February 2016.

227.   Further, Defendant Trabelsi knew that due to his refusal to transfer or cause the transfer of the Free-Trading Telsi Shares to Plaintiff B2 or its designee, he would not receive cooperation from Znergy-Mazzal in transferring the Property (to The Mazzal Trust as originally contemplated in the SP Agreement).

228.  Defendants Trabelsi, individually and as trustee of The Mazzal Trust and The Bany's Living Trust, Aliza Trabelsi, individually and as trustee of the The Bany's Living Trust, and Massachusetts Mazzal, have intentionally and wrongfully exercised dominion and control over the Property and thus committed a fraudulent transfer of the Property.

229.   Znergy-Mazzal did not become aware of such fraudulent transfer of the Property until recently, because Defendants Trabelsi, Aliza Trabelsi and Massachusetts Mazzal  never informed Znergy-Mazzal of having taken that action.

230.   There is an actual and currently justiciable controversy concerning rightful title to the Property.

231.   Pursuant to 28 U.S.C. § 2201 (a) and Fed.R.Civ. P. 57, Plaintiff B2, as assignee of Znergy-Mazzal's claims and causes of action,  requests that this Court enter a declaratory judgment enforceable against Defendants Trabelsi, individually and as trustee of The Mazzal Trust and The Bany's Living Trust, Aliza Trabelsi, individually and as trustee of The Bany's Living Trust, and Massachusetts Mazzal, each whether acting in their own respective names or in the name of "Shawn Telsi" or anyone else, that:

(A)  the Fake Deed is fraudulent, void and of no effect, because the purported grantor in the Fake Deed, Massachusetts Mazzal, was not the owner of the Property at the time the Fake Deed was signed or filed;

(B)  Znergy-Mazzal is the lawful owner of the Property in which title is quieted;

(C)  Znergy-Mazzal is not required to transfer the Property to The Mazzal Trust or to Defendant Trabelsi as trustee of the The Mazzal Trust, nor to any other person or entity;  and

(D)  Znergy-Mazzal is entitled to retain the benefit of any improvements and fixtures, if any, placed on the Property by or at the request of any Defendant.

## COUNT IV:

**Plaintiff B2, Assignee's Common Law Fraud
Claim Against Defendant Trabelsi, Individually
and as Trustee, Aliza Trabelsi, Individually and as
 Trustee, and Defendant VStock**

232.   Paragraphs 1 through 231 above are incorporated by reference as if fully restated in this Count.

233.   At the time of signing and e-mailing the SP Agreement and the Escrow Agreement on or about February 8, 2016, Defendant Trabelsi knew that Znergy-Mazzal would be under different management immediately thereafter and that the new management of Znergy-Mazzal did not know that he did not intend to sell or transfer the Free-Trading Telsi Shares to Plaintiff B2 or that he had submitted the inconsistent paperwork on or about February 5, 2016.

234.   Defendant Trabelsi intended that he would walk away with the $315,000 cash sale proceeds and still be in a position to sell or cause the sale of some part or all of the Free-Trading Telsi Shares into the OTC Market and so receive payment twice for the same shares.

235.   Defendant Trabelsi was Znergy-Mazzal's sole Director and CEO until his resignation, and accordingly he owed fiduciary duties to Znergy-Mazzal, including without limitation the duty of loyalty and the duty of full and fair disclosure of his intentions and actions that would affect Znergy-Mazzal's financial and business development plans and prospects.

236.   At relevant times, Defendant VStock was Znergy-Mazzal's stock transfer agent and registrar and accordingly was a fiduciary of Znergy-Mazzal.

237.   As a fiduciary of Znergy-Mazzal, Defendant VStock owed Znergy-Mazzal the duty of full and fair disclosure of material information relevant to the services that Defendant VStock was performing and had agreed to perform as transfer agent for Znergy-Mazzal

238.   Defendants Trabelsi (individually and using the name "Shawn Telsi" and as trustee of The Mazzal Trust) and VStock each, knowingly and intentionally, or, in the alternative, in conscious and reckless disregard for the truth:

(A)  made misrepresentations of material fact to Znergy-Mazzal, directly and by making them to the Lawyer Defendants, and Znergy-Mazzal, under the transitioning new management, reasonably relied thereon to its detriment; and

(B)  omitted to state material facts to Znergy-Mazzal that were necessary to make the statements made by or on behalf of Defendant Trabelsi and VStock not misleading, and Znergy-Mazzal, under the transitioning new management, reasonably relied on the absence of such omitted facts to its detriment.

239.   The material misrepresentations made by Defendants Trabelsi and VStock to Znergy-Mazzal, and the material facts that Defendants Trabelsi and VStock omitted to state to Znergy-Mazzal, include, without limitation, those specified for each such respective Defendant in Count I of this Complaint.

240.   If Defendants Trabelsi and VStock had not defrauded Znergy-Mazzal (and B2), then Defendant Trabelsi, whether in his name, as "Shawn Telsi", or in another name, would not have been able to sell or direct the sale of millions of shares of free-trading stock into the OTC Market, suppressing and destabilizing the market price, when Znergy-Mazzal was preparing and determining investor interest in its intended private placement sale of original issue stock.

241.   As of February 4, 2016, Defendant Trabelsi was aware that Znergy-Mazzal intended to raise additional capital through a private placement promptly after the completion of the February 2016 stock sale under the SP Agreement.

242.   Znergy-Mazzal, while transitioning management from Defendant Trabelsi to Floyd (who already had been participating in management), and as a corporation with shareholders other than just Trabelsi, reasonably relied on the misrepresentations of material fact made by

Defendants Trabelsi and VStock and reasonably assumed and relied on the non-existence of the material facts that Defendants Trabelsi and VStock omitted to disclose to Znergy Mazzal.

243.   As a direct, foreseeable and proximate result of the fraudulent misrepresentations and omissions of material fact committed by Defendants Trabelsi, individually or as Shawn Telsi or trustee of The Mazzal Trust, and by Defendant VStock, Znergy-Mazzal suffered damages, including without limitation, its inability to raise capital due to the suppression and destabilization of the Znergy-Mazzal OTC Market sale price caused by sales of portions of the Free-Trading Telsi Shares into the OTC Market  by or at Defendant Trabelsi's direction at a time when they should have been in the possession and control of Plaintiff B2 or its designee(s).

244.   Plaintiff B2, as assignee of Znergy-Mazzal's claims and causes of action, hereby sues Defendants Trabelsi (in the above stated capacities) and VStock for common law fraud and for all recoverable damages resulting therefrom.

## COUNT V:
### Plaintiff B2's Request for Declaratory Judgment

245.   Paragraphs 1 through 244 of this Complaint are incorporated in the Count by reference as if fully restated in this Count.

246.    There is an actual and currently justiciable controversy concerning rightful ownership of the Free-Trading Telsi Shares.

247.    Pursuant to 28 U.S.C. § 2201 (a) and Fed.R.Civ. P. 57, Plaintiff B2 requests a declaratory judgment enforceable against Defendants Trabelsi, individually and as trustee of The Mazzal Trust and The Bany's Living Trust, and Aliza Trabelsi, individually and as trustee of The Bany's Living Trust, whether using the name "Shawn Telsi", Defendant Trabelsi's sister, or any other name, and Magnolia Road LLC, that:

(A)    Plaintiff B2 bought and fully paid for the 9,500,000 Free-Trading Telsi Shares under the SP Agreement;

(B)    Plaintiff B2 is (and has been since February 8, 2016) the rightful owner of the Free-Trading Telsi Shares;

(C)    Defendants Trabelsi and Aliza Trabelsi (in all of their above-stated capacities), Massachusetts Mazzal, and Magnolia Road LLC are directed to transfer and deliver to Plaintiff B2 or its designee all of the portions of the Free-Trading Telsi Shares not yet sold into the OTC Market and in their possession, custody or control in any name or capacity, including without limitation "Shawn Telsi";

(D)    Plaintiff B2 is and has been since February 8, 2016 the rightful owner of all proceeds of sale of any Free-Trading Telsi Shares that have been sold into the OTC Market or otherwise;

(E)    Plaintiff B2 is entitled to a prompt, full accounting from the persons and entities described in paragraph 247(C) above of all sales of any Free-Trading Telsi Shares, all proceeds of sale received for any such sales, all transfers of such proceeds, when and by whom the proceeds were received, and the current repository of such proceeds or assets acquired with such proceeds; and

(F)    to the extent that any of the Defendants described in paragraph 247(C) above, directly or through any controlled entities, transferees or assignees, has received or is holding any proceeds of sale of any of the Free-Trading Telsi Shares,  such persons and entities do so only as constructive trustees and agents for Plaintiff B2 and must pay over all such proceeds to Plaintiff B2 promptly.

### COUNT VI:
### Plaintiff B2's Unlawful Conversion
### Claim Against Defendants Trabelsi And VStock

248.     Paragraphs 1 through 247 of this Complaint are incorporated by reference as if fully restated in this Count.

249.     Defendant Trabelsi, whether acting in his own name or as "Shawn Telsi", or with Shawn Telsi (if he is a separate individual) or using any family member name, such as his sister, has intentionally and wrongfully exercised dominion and control over the Free-Trading Telsi Shares to the detriment of and in derogation of the ownership rights of their rightful owner, Plaintiff B, and, without limitation on the foregoing, has refused to deliver the Free-Trading Telsi Shares to their rightful owner, Plaintiff B2.

250.   Defendant VStock has knowingly participated in the perpetration and effectuation of Defendant Trabelsi's unlawful conversion of the 9,500,000 Free-Trading Telsi Shares from Plaintiff B2 and in share transfer maneuvers designed to trick Plaintiff B2 into initially believing that the 9,500,000 Free-Trading Telsi Shares had been transferred as required by the SP Agreement and the Escrow Agreement.

251.   Additionally, by processing the DWAC form for the transfer of the 9,500,000 Free-Trading Telsi Shares from Shawn Telsi to Shawn Telsi (rather than to Plaintiff B2 or its designee) on or about February 5, 2016, Defendant VStock denied Plaintiff B2 or its designee record ownership of such shares, while knowing, through Shir Hochman, Director of Client Services, and Joseph Donohue, that such shares were to be transferred to Plaintiff B2 or its designee as part of the SP Agreement transaction.

252.   Defendant Trabelsi and Defendant VStock have unlawfully converted the 9,500,000 Free-Trading Telsi Shares from Plaintiff B2.

253.   Plaintiff B2 has suffered damages as a direct, foreseeable, and proximate cause of the unlawful conversion of the Free-Trading Telsi Shares by Defendant Trabelsi and Defendant VStock.

254.   Plaintiff B2 hereby sues Defendants Trabelsi and VStock for unlawful conversion of 9,500,00 Free-Trading Telsi Shares (and the proceeds of sale of any of them) and for all resulting recoverable losses and damages proximately caused by such conversion.

### COUNT VII:
### Plaintiff B2's Breach of Fiduciary Duty Claim
### Against Defendants Lloyd and Kirton

255.   Plaintiff re-alleges and incorporates paragraphs 1 through 254 of this Complaint by reference as if fully restated in this Count.

256.    In the Escrow Agreement, Defendant Kirton, acting through Defendant Lloyd, agreed to act as escrow agent for the parties to the SP Agreement, which included Plaintiff B2.

257.   The Lawyer Defendants had a fiduciary relationship with and fiduciary duties to Plaintiff B2 as one of the parties for which the Lawyer Defendants had agreed to act as escrow agent under the Escrow Agreement, and those fiduciary duties included, without limitation, the following:

(A)   A duty to exercise the same degree of care in protecting and advancing Plaintiff B2's property, rights and interests subject to the Escrow Agreement as the Lawyer Defendants would exercise with respect to their own property, rights and interests;

(B)   A duty not to disburse the Escrow Funds until one of the two alternative conditions to disbursement in paragraph 2 of the Escrow Agreement had been met;

(C)   A duty to comply with the terms of the Escrow Agreement in good faith;

(D)   A duty to carry out the Lawyer Defendants' "duties as Escrow Agent in an impartial and professional manner";

(E)   A duty to make a good faith, diligent and competent inquiry to verify that one of the two alternative conditions in Escrow Agreement paragraph 2 to disbursement of the escrowed funds had been satisfied before disbursing the Escrow Funds;

(F)   A duty to make diligent and competent inquiry about whether or not the selling shareholders in the SP Agreement and the Escrow Agreement had complied with their obligations before releasing the $315,000 Escrow Funds provided by Plaintiff B2 to or as directed by Defendant Trabelsi (and before paying Defendant Kirton $10,000 and Defendant VStock $5,000 from the additional funds provided by Plaintiff B2);

(G)   A duty not to represent to any party to the Escrow Agreement, including without limitation Plaintiff B2 and Znergy-Mazzal, that one of the alternative conditions in paragraph 2 of the Escrow Agreement had been met, if the Lawyer Defendants had not diligently and competently verified or did not have adequate information to verify such satisfaction;

(H)   A duty to fully and fairly disclose to Plaintiff B2 all material facts known or that reasonably should have been known to the Lawyer Defendants about the manner in which their relationship with or deference to any other parties to the Escrow Agreement could adversely affect the Lawyer Defendants' willingness or ability to perform their escrow agent duties in good faith, impartially, and in a professional manner, including without limitation regarding the Escrow Funds provided by Plaintiff B2;

(I)   A duty to advise Plaintiff B2 that it should engage separate, independent legal counsel to negotiate fair and honest terms for the Escrow Agreement, because the Lawyer Defendants included subparagraphs 5.a and 5.d in the Escrow Agreement purporting to

exculpate, release and indemnify themselves from their own negligence (but not for their gross negligence or willful misconduct); and

(J)   A duty to advise Plaintiff B2 that it should engage independent legal counsel to represent it in the closing of the SP Agreement transaction, as the Lawyer Defendants were in a conflict position as legal counsel, purporting to be lawyers for "the transaction" or "the deal" in conversations with Plaintiff B2's Peterson, providing legal advice and services to Plaintiff B2, and assuring Peterson that they could handle everything to close the transaction, while also giving legal advice to Defendant Trabesi and asserting in the Escrow Agreement that they were counsel to Znergy-Mazzal.

258.    Additionally, the Lawyer Defendants owed fiduciary duties to Plaintiff B2, including without limitation duties of loyalty, due care, due diligence, full, fair and timely disclosure of material facts, and competent and zealous representation of Plaintiff B2 in the preparation and closing of the stock purchase transaction under the SP Agreement, because, by their actions, the Lawyer Defendants created an attorney-client relationship with Plaintiff B2 or, at a minimum, a reasonable reliance and expectation by Plaintiff B2 that the Lawyer Defendants would protect Plaintiff B2's interests.

259.    The Lawyer Defendants' actions that created the attorney-client relationship with, or such reasonable reliance and expectation by, Plaintiff B2 included, *inter alia*, the following:

(A)   legally counseling Plaintiff B2 (including on its legal obligations as a Znergy-Mazzal shareholder during the period November 2015 through February 2016, at a minimum;

(B)   representing Plaintiff B2 with respect to the Lone Cypress Agreement while also preparing the SP Agreement and the Escrow Agreement;

(C)   claiming to be "lawyer for the transaction" or "lawyer for the deal"; and

(D)   repeatedly soliciting legal work on new matters from Peterson, Plaintiff B2's managing member, during the negotiations of the SP Agreement terms.

260.     The Lawyer Defendants, both as escrow agent and legal counsel, breached their fiduciary duties to Plaintiff B2 by, among other things:

(A)     The failures described in paragraphs 105-119 of this Complaint;

(B)     misrepresenting to Plaintiff B2 the status of Defendant VStock's receipt of documentation satisfying one of the two alternative conditions to disbursement of the Escrow Funds, notwithstanding the Lawyer Defendants' lack of knowledge and lack of due care and diligent effort to verify that status;

(C)     the failures to make disclosures and to provide proper advice described in paragraphs 71(A)-(D) and 72-75 of this Complaint;

(D)     Failing to establish any direct contact whatsoever with "Shawn Telsi" and to verify that the electronic signature of "Shawn Telsi" on the SP Agreement and the Escrow Agreement had been provided or authorized by a real individual named Shawn Telsi or, alternatively, to obtain written confirmation from Defendant Trabelsi that Shawn Telsi was his alter ego and alias that he could legally bind to the SP Agreement and the Escrow Agreement;

(E)     Failing to verify and document that "Shawn Telsi" had authorized Defendant Trabelsi to receive the portion of the sale proceeds under the SP Agreement and the Escrow Agreement to be paid to "Shawn Telsi" for the Free-Trading Telsi Shares;

(F)     Failing to inform Plaintiff B2 that by "trusting" Trabelsi to deliver the appropriate portion of the $315,000 net share sale proceeds to "Shawn Telsi", the Lawyer Defendants were taking a risk of unknown proportion with Plaintiff B2's money and rights under the SP Agreement and the Escrow Agreement (particularly where the Lawyer Defendants knew that the

Free-Trading Telsi Shares represented approximately 79% of the free-trading shares of stock in Znergy-Mazzal);

(G)    Failing to advise Plaintiff B2 adequately that the Lawyer Defendants' prior representation of Znergy-Mazzal (while in the control of Defendant Trabelsi) and Defendant Trabelsi could prejudice the Lawyer Defendants' attentiveness to ensuring the conditions to release of the escrowed funds had been met; and

(H)    Failing to advise Plaintiff B2 to obtain separate counsel to protect its rights and interests with respect to negotiating and finalizing the terms of the Escrow Agreement.

261.    As a direct, foreseeable and proximate result of the Lawyer Defendants' breaches of their fiduciary duties to Plaintiff B2, Plaintiff B2 has suffered damages, and Plaintiff B2 hereby sues the Lawyer Defendants (Lloyd and McKonkie) for breach of fiduciary duty and for all recoverable damages proximately caused by the Lawyer Defendants' breaches of fiduciary duty.

### COUNT VIII:
### Plaintiff B2, Assignee's Claim for Breach of
### Fiduciary Duty Against Defendants Lloyd and Kirton

262.    Paragraphs 1 through 261 of this Complaint are incorporated herein by reference as if fully restated in this Count.

263.    In the Escrow Agreement, the Lawyer Defendants agreed to act as escrow agent for the parties to the SP Agreement, which included Znergy-Mazzal.

264.    The Lawyer Defendants had a fiduciary relationship with and fiduciary duties to Znergy-Mazzal as one of the parties for which the Lawyer Defendants were acting as agent under the Escrow Agreement, and those fiduciary duties to Znergy-Mazzal included, without limitation, the same duties that the Lawyer Defendants had as Escrow Agent to Plaintiff B2 described in paragraph 257(A)-(I) above.

265.    Additionally, the Lawyer Defendants were legal counsel to Znergy-Mazzal as client and thus had fiduciary duties to Znergy Mazzal that included the duties of loyalty, due care, due diligence, full, fair and timely disclosure of material facts, and competent and zealous representation of Znergy-Mazzal in the preparation and closing of the stock purchase transaction under the SP Agreement.

266.    The Lawyer Defendants, both as Escrow Agent and as attorneys for Znergy-Mazzal, breached their fiduciary duties to Znergy-Mazzal by, among other things, the following actions and omissions:

(A)    Failing to advise Znergy-Mazzal to obtain separate and independent counsel to negotiate the Escrow Agreement with the Lawyer Defendants and advise it concerning the terms of the Escrow Agreement, because the Lawyer Defendants drafted the Escrow Agreement in such a manner as to purport to provide exculpation, release and indemnification for the Lawyer Defendants' own negligence;

(B)    The Lawyer Defendants' failures and acts described in Count VII, subparagraphs 260(A), (D) and (E) above;

(C)    Failing to require that Defendant Trabelsi engage separate counsel for his personal interests that he was advancing in the SP Agreement and the Escrow Agreement or to advise Znergy-Mazzal to have counsel separate from Defendant Trabelsi's counsel; and

(D)    Failing to represent Znergy-Mazzal's interests in a manner that recognized them to be separate and apart from Defendant Trabelsi's interests and that required serious scrutiny of Trabelsi's actions to ensure that he was not left in a position to harm Znergy-Mazzal by retaining most of the company's freely trading shares that he could then sell into the OTC Market in a manner that would destabilize the market price for Znergy-Mazzal's stock.

267. As a direct, foreseeable and proximate result of the Lawyer Defendants' breaches of their fiduciary duties to Znergy-Mazzal, Znergy-Mazzal has suffered damages.

268. Plaintiff B2, as Assignee of Znergy-Mazzal's claims and causes of action, hereby sues the Lawyer Defendants (Park and McKonkie) for breach of their fiduciary duties to Znergy-Mazzal and for all recoverable damages proximately caused by the Lawyer Defendants' breaches of fiduciary duty.

### COUNT IX:
### Plaintiff B2's Claim for Gross Negligence
### Against Defendants Lloyd and Kirton

269. Paragraphs 1 through 268 of this Complaint are incorporated by reference as if fully restated in this Count.

270. Defendant Kirton, acting through shareholder Defendant Lloyd, undertook duties to Plaintiff B2 as an escrow agent holding and agreeing to disburse, only upon satisfaction of tone of the two alternative specified conditions, the $315,000 of Escrow Funds.

271. The Lawyer Defendants' duties as escrow agent under and resulting from the Lawyer Defendants' preparation, and the Lawyer Defendants' and other parties' (including Plaintiff B2's) execution, of the Escrow Agreement included, without limitation, those described in paragraph 257 (A)-(J) above, incorporated herein by reference.

272. The Lawyer Defendants performed and failed to perform their duties under the Escrow Agreement with a conscious and reckless disregard for, an utter indifference to and utter forgetfulness of their legal obligations, Plaintiff B2's rights, and the consequences to Plaintiff B2 of the Lawyer Defendants' disregard of their duties.

273. The Lawyer Defendants' performance and failure to perform their duties, including without limitation as described in paragraph 260(A)-(H) above, fell below the standard of care of

reasonable escrow agents acting in the same or similar circumstances, and the deficiency was egregious, reckless, and characterized by an absence of even slight diligence and a want of even scant care.

274.    Additionally, the Lawyer Defendants performed and failed to perform their duties as legal counsel to Plaintiff B2 with a conscious and reckless disregard for, an utter indifference to and utter forgetfulness of their legal obligations, Plaintiff B2's rights, and the consequences to Plaintiff B2 of the Lawyer Defendants' disregard of their duties.

275.    The Lawyer Defendants' performance and failure to perform their duties as legal counsel, including without limitation as described in paragraph 260(A)-(H) above, fell below the standard of care of reasonable legal counsel acting in the same or similar circumstances, and the deficiency was egregious, reckless, and characterized by an absence of even slight diligence and a want of even scant care.

276.    The Lawyer Defendants were grossly negligent in the performance of their duties as Escrow Agent under and arising out of the Escrow Agreement and as attorneys acting as legal counsel to Plaintiff B2 during the period relevant to negotiating, documenting and closing the SP Agreement transaction, and such gross negligence proximately, directly and foreseeably caused damages to Plaintiff B2.

277.    Plaintiff B2 hereby sues the Lawyer Defendants for gross negligence (and gross legal malpractice) and for all recoverable damages proximately caused by such gross negligence.

**COUNT X:**
**Plaintiff B2, Assignee's Claim For**
**Gross Negligence Against**
**Defendants Lloyd And Kirton**

278.    Paragraphs 1 through 277 of this Complaint are incorporated by reference as if fully

restated in this Count.

279.   The Lawyer Defendants' duties as escrow agent under and resulting from the Lawyer Defendants' preparation, and the Lawyer Defendants' and other parties' (including Plaintiff B2's) execution, of the Escrow Agreement included, without limitation, those described in paragraph 264 above, incorporated herein by reference.

280.   The Lawyer Defendants performed and failed to perform their duties under the Escrow Agreement with a conscious and reckless disregard for, an utter indifference to and utter forgetfulness of their legal obligations, Znergy-Mazzal's rights, and the consequences to Znergy-Mazzal of the Lawyer Defendants' conscious and reckless disregard of their duties under and arising out of the Escrow Agreement.

281.   The Lawyer Defendants' performance and failure to perform their duties, including without limitation as described in paragraph 266(A)-(D) above, fell below the standard of care of reasonable escrow agents acting in the same or similar circumstances, and the deficiency was egregious, reckless, and characterized by an absence of even slight diligence and care.

282.   The Lawyer Defendants were grossly negligent in the performance of their duties as Escrow Agent under and arising out of the Escrow Agreement.

283.   At relevant times, the Lawyer Defendants also were legal counsel to Znergy-Mazzal (without limitation on any other party for which the Lawyer Defendants also were counsel).

284.   The Lawyer Defendants owed Znergy-Mazzal the duties of loyalty, due care, due diligence, full, fair and timely disclosure of material facts related to their legal services for Znergy-Mazzal, and zealous and competent legal representation.

285.   The Lawyer Defendants breached their duties as legal counsel to Znergy-Mazzal, including without limitation as described in paragraph 266(A)-(D).

286.   The Lawyer Defendants' representation of Znergy-Mazzal not only fell below the accepted standard of care, practice and quality that an ordinary and reasonable lawyer would have performed under the same or similar circumstances; the deficiency was egregious, reckless, and characterized by an absence of even slight diligence and a want of even scant care.

287.   The Lawyer Defendants acted in conscious and reckless disregard of, and showed an utter indifference to and utter forgetfulness of their legal duties to their client, Znergy-Mazzal, and to and of the foreseeable consequences to Znergy-Mazzal of the Lawyer Defendants' breaches of the standard of care.

288.   The Lawyer Defendants were grossly negligent in their performance as legal counsel to Znergy-Mazzal (thus committing gross legal malpractice).

289.   The Lawyer Defendants' gross negligence, both in their legal representation of Znergy-Mazzal and in their performance and non-performance as Escrow Agent under the Escrow Agreement, directly, foreseeably and proximately caused Znergy-Mazzal damages.

290.   Plaintiff B2, as Assignee of Znergy-Mazzal's claims and causes of action, hereby sues the Lawyer Defendants for gross negligence (and gross legal malpractice) and for all recoverable damages proximately caused by such gross negligence.

## COUNT XI:
### Plaintiff B2, Assignee's Negligence/Legal Malpractice
### Claim Against Defendants Lloyd and Kirton

291.  Paragraphs 1 through 290 above are incorporated by reference as if fully restated in this Count.

292.  The Lawyer Defendants' representation of Znergy-Mazzal fell below the accepted standard of care, practice and quality that an ordinary and reasonable lawyer would have performed under the same or similar circumstances.

293.   The Lawyer Defendants breached their duties as attorneys to Znergy-Mazzal and committed negligence and malpractice in their representation of Znergy-Mazzal.

294.    As a direct and foreseeable result of the Lawyer Defendants' breach of their duties to Znergy-Mazzal, Znergy-Mazzal has suffered damages.

295.  Plaintiff B2, as Assignee of Znergy-Mazzal's claims and causes of action, hereby sues the Lawyer Defendants for negligence (and legal malpractice) and for all recoverable damages proximately caused by such negligence.

**COUNT XII:**
**Plaintiff B2's Request for Specific Performance**
**Under the SP Agreement**

296.  Paragraphs 1 through 295 above are incorporated by reference as if fully restated in this Count.

297. Section 6.13 of the SP Agreement entitles Plaintiff B2 to "enforce specifically any provision of this Agreement, in addition to any other remedy to which [it] may be entitled and without having to prove the adequacy of any other remedy [it] may have at law or in equity and without being required to post bond or other security."

298.  Plaintiff B2 hereby demands specific performance by Defendant Trabelsi, using the alias "Shawn Telsi" or otherwise, of sections 1.1, 1.2(a), and 1.2(e)(ii) of the Agreement, and requests that this Court Order Defendant Trabelsi, whether as himself, as "Shawn Telsi", or otherwise, to promptly transfer and deliver the 9,500,000 Free-Trading Telsi Shares to Plaintiff B2, or to transfer and deliver such number of them as he has not yet sold or caused to be sold into the OTC Market after February 8, 2016 and acquire promptly in the OTC Market a number of free-trading Znergy-Mazzal shares equal to the number of Free-Trading Telsi Shares that he

cannot deliver due to sales thereof after February 8, 2016 and promptly deliver those purchased newly purchased shares to Plaintiff B2 or its designee.

## COUNT XIII:

### Plaintiff B2's Claims for Violations of M.G.L. c. 93A, §§ 2 & 11, Against Defendant Trabelsi, Individually, as "Shawn Telsi" and as Trustee of The Mazzal Trust

299.    Plaintiff B2 re-alleges and incorporates paragraphs 1 through 298 by reference as if fully restated in this Count.

300.    At relevant times, Defendant Trabelsi, acting in his own name, in the name of "Shawn Telsi", and as trustee of The Mazzal Trust, has resided in and has been engaged in the conduct of trade or commerce in Massachusetts.

301.    At relevant times, Plaintiff B2 was engaged in the conduct of trade or commerce.

302.    At relevant times, Defendant Trabelsi was engaged in the conduct of trade or commerce in Massachusetts, both in his own name and using the alias "Shawn Telsi".

303.    The center of the SP Agreement transaction was Massachusetts.

304.    Defendant Trabelsi, individually and using the name "Shawn Telsi", and as Trustee of The Mazzal Trust, committed fraudulent and dishonest acts, including without limitation those referenced in Counts I and II above, which are incorporated herein by reference.

305.    Defendant Trabelsi's actions constituted unfair and deceptive acts or practices employed by him, in violation of M.G.L. 93A, Sections 2 and 11.

306.    As a result of such Defendants' use or employment of unfair or deceptive acts or practices in Massachusetts, Plaintiff B2 suffered a loss of money and property-specifically, the 9,500,000 Free-Trading Telsi Shares that B2 purchased.

307.   Plaintiff B2 hereby sues Defendants Trabelsi, individually and as Trustee of the Mazzal Trust, and acting in the name "Shawn Telsi", for all recoverable losses of money and property, and for any and all other recoverable damages, resulting from his use or employment of unfair or deceptive acts and practices in violation of M.G.L. c. 93A, , §§ 2 & 11.

**COUNT XIV:**
**Plaintiff B2, Assignee's Claims Under**
**M.G.L. c. 93A, §§ 2 & 11, Against Defendants**
**Trabelsi, Aliza Trabelsi, and Massachusetts Mazzal**

308.  Paragraphs 1 through 307 are incorporated herein by reference as if fully restated in this Count.

309.   At relevant times, Znergy-Mazzal has been engaged in the conduct of trade or commerce.

310. The center of the share sale transaction in the SP Agreement was Massachusetts, and Defendant Massachusetts Mazzal is a Massachusetts corporation.

311.  The Property is located in Massachusetts.

312.  At relevant times, Defendant Aliza Trabelsi has resided in Massachusetts.

313.  Defendant Trabelsi, individually and using the name "Shawn Telsi", and as Trustee of The Mazzal Trust, committed fraudulent and dishonest acts, including without limitation those referenced in Counts I, II,  III and IV above, which are incorporated by reference as if fully restated in this paragraph.

314.  Without limitation on paragraph 305 above, Defendant Trabelsi used Defendant Massachusetts Mazzal to appear as the grantor in the Fake Deed of the Property to The Bany's Living Trust, at a time when Znergy-Mazzal had legal title to and was the owner of the Property.

315.  Defendants Trabelsi and Aliza Trabelsi, as trustees and primary beneficiaries, established The Bany's Living Trust and used it to receive the Fake Deed of the Property.

316. The actions of Defendant Trabelsi, Aliza Trabelsi, and Massachusetts Mazzal constituted unfair and deceptive acts or practices employed by them, in violation of M.G.L. 93A, Sections 2 and 11.

317.    Znergy-Mazzal suffered a loss of money and property as a result of such Defendants' use or employment of unfair or deceptive acts or practices.

318.    Plaintiff B2, as Assignee of Znergy-Mazzal's claims and causes of action,  hereby sues Defendants Trabelsi (individually and as Trustee of The Mazzal Trust and The Bany's Living Trust, and acting in the name "Shawn Telsi"),  Defendant Aliza Trabelsi (individually and as trustee of The Bany's Living Trust) and Defendant Massachusetts Mazzal, for all recoverable losses of money and property, and all other recoverable damages, resulting from their use or employment of unfair or deceptive acts and practices in violation of M.G.L. c. 93A, , §§ 2 & 11.

## COUNT XV:

**Plaintiff B2's Unjust Enrichment Claim Against
Defendants Trabelsi and Aliza Trabelsi, Individually
and as Trustees**

319.    Plaintiff incorporates by reference paragraphs 1-318 above as if fully restated in this Count.

320.    Defendant Trabelsi, as "Shawn Telsi", his alias and alter ego, or alternatively, as agent for Shawn Telsi, agreed in the SP Agreement to sell and transfer the 9,500,000 Free-Trading Telsi Shares to Plaintiff B2 or its designee.

321.    Alternatively, Defendant Trabelsi presented the SP Agreement as signed electronically by or for Shawn Telsi, knowing that Shawn Telsi had not authorized such signature.

322.    Plaintiff B2 paid the full agreed purchase price for the Free-Trading Telsi Shares.

323.    On February 8, 2016, Defendant Trabelsi delivered the SP Agreement to Plaintiff B2 and the Lawyer Defendants knowing that the Free-Trading Telsi Shares would not be transferred and delivered as required by the SP Agreement.

324.    Defendant Trabelsi has received substantial benefits from retaining the purchase money for the Free-Trading Telsi Shares and refusing to deliver them, as their market price increased shortly after the alleged closing on the SP Agreement and have remained at a higher average price during certain periods (although dropping repeatedly due to the actions of Defendant Trabelsi, as or for "Shawn Telsi", his transferee, or otherwise, in selling or causing the sale of many free-trading shares into the OTC Market).

325.    Additionally, Defendant Trabelsi as "Shawn Telsi" or a transferee thereof has sold or caused to be sold millions of the Free-Trading Telsi Shares into the OTC Market, generating sale proceeds of up to an estimated $649,845 in the aggregate from February 9, 2016 through January 4, 2017, which sale proceeds properly belong to Plaintiff B2.

326.    On information and belief, Defendants Trabelsi and Aliza Trabelsi, individually or as trustees and primary beneficiaries of The Bany's Living Trust, caused at least some of the proceeds from sales of some of the Free-Trading Telsi Shares to be paid or transferred into or for the benefit or use of The Bany's Living Trust, their family trust into which Defendant Trabelsi transferred the Property using the Fake Deed and that loaned $1.3 million to Defendant Magnolia Road LLC pursuant to the September 30, 2016 mortgage between them.

327.  Defendant Trabelsi, individually, as "Shawn Telsi" and as trustee of The Bany's Living Trust, and Aliza Trabelsi, as trustee of The Bany's Living Trust, ought not be allowed to retain the benefits of possession or control of any Free-Trading Telsi Shares or the proceeds of

sale of any of them that they have received, and it would be unjust and inequitable to allow them to do so.

328.  Plaintiff B2 was unjustly and inequitably harmed by such Defendants' conduct, and Defendants Trabelsi and Aliza Trabelsi, individually and as trustees of The Bany's Living Trust, were unjustly enriched at Plaintiff B2's expense.

329.  Accordingly, Defendants Trabelsi (including as "Shawn Telsi") and Aliza Trabelsi should be ordered to return the portion of the 9,500,000 Free-Trading Telsi Shares not yet sold into the OTC Market that either of them has or controls individually, in the name Shawn Telsi, or as Trustee of The Bany's Living Trust or any other trust or in any other name or capacity, and such Defendants should be required to pay to Plaintiff B2  all proceeds of any sale received by any of them from the sale of any portion of those Free-Trading Telsi Shares.

**COUNT XVI:**
**Plaintiff B2, Assignee's Claim for Unjust Enrichment**
**Against Defendants Trabelsi and Aliza Trabelsi,**
**Individually and as Trustees**

330.   Paragraphs 1 through 329 above are incorporated by reference as if fully restated in this Count.

331.   Defendant Trabelsi fraudulently transferred the Property to The Bany's Living Trust, of which Defendants Trabelsi and Aliza Trabelsi are co-trustees and co-primary beneficiaries, using the Fake Deed.

332.   Defendant Trabelsi and Aliza Trabelsi thus took and received an unjust benefit that was both transferred fraudulently and part of a transaction under the SP Agreement in which Defendant Trabelsi's fraud provided him, albeit unlawfully, other benefits unjustly-e.g.,retention of the Free-Trading Telsi Shares despite having received payment in full for them.

333.  Defendant Trabelsi, individually, as "Shawn Telsi" and as trustee of The Bany's Living Trust, and Aliza Trabelsi, individually and as trustee of The Bany's Living Trust, ought not be allowed to retain title to, the benefits of and control over the Property, and it would be unjust and inequitable to allow them to retain such title and benefits.

334.  Znergy-Mazzal was unjustly and inequitably harmed by such Defendants' conduct, and such Defendants were unjustly enriched at Znergy-Mazzal's expense.

335.  Accordingly, Defendants Trabelsi and Aliza Trabelsi should be ordered to convey the Property by quitclaim deed, without any burdens on or exceptions to fee simple title except those that already existed as of February 4, 2016, to Znergy-Mazzal or, in the alternative, to pay to Plaintiff B2, as Assignee of Znergy-Mazzal's claims, the full fair market value of the Property as of that date without any consideration for liens or other burdens placed on it by Defendant Trabelsi or any other Defendant on or after February 4, 2016.

## COUNT XVII:

### Plaintiff B2's Breach of Contract Claims
### Against Defendants Trabelsi and Kirton

336.  Paragraphs 1 through 335 above are incorporated by reference as if fully restated in this Count.

337.  Defendant Trabelsi, using his alias "Shawn Telsi" or acting as agent for "Shawn Telsi", agreed in the SP Agreement, a valid and binding contract, to sell and transfer the Free-Trading Telsi Shares to Plaintiff B2 or its designee, and Defendant Trabelsi received (and e-mailed his acknowledgment of receipt of) the agreed payment for such shares.

338.  Plaintiff B2 fully performed and satisfied all conditions precedent under the SP Agreement to receive, directly or through designees, a transfer of the Free-Trading Telsi Shares.

339.   Defendant Trabelsi, using the alias or acting as agent for "Shawn Telsi", breached the SP Agreement by breaching, at a minimum, Sections 1.1, 1.2(a) and 1.2(e)(ii) thereof, which were material to Plaintiff and in fact core terms of the SP Agreement transaction.

340.   Defendant Trabelsi's breach of the SP Agreement caused Plaintiff B2 to suffer economic damages.

341.   Plaintiff B2 hereby sues Defendant Trabelsi, including as, in the name of or as agent for "Shawn Telsi", for breach of the SP Agreement and for all recoverable damages caused by such breach, including without limitation actual, consequential and incidental damages.

342.   Defendant Kirton, a law firm acting through its shareholder attorney, Defendant Lloyd, signed and agreed to be bound by the Escrow Agreement, which was a valid and binding contract (except as to subsections 5.a and 5.d thereof for reasons described above).

343.   Plaintiff B2 fully performed and satisfied all conditions precedent to being entitled to Defendant Kirton's performance of its obligations under the Escrow Agreement.

344.   Defendant Kirton breached Sections 2 and the second sentence of Section 11 of the Escrow Agreement, which were material to the contract, and Defendant Kierton's breaches caused Plaintiff B2 to suffer economic damages.

345.   Plaintiff B2 hereby sues Defendant Kirton for breach of the Escrow Agreement and for all recoverable damages caused by that breach, including without limitation actual, consequential and incidental damages.

### COUNT XVIII:
### Plaintiff B2, Assignee's Breach of Fiduciary
### Duty Claim Against Defendant VStock

346.   Paragraphs 1 through 345 above are incorporated herein by reference as if fully restated in this Count.

347.   In February 2016 and thereafter until late December 2016, Defendant VStock was Znergy-Mazzal's transfer agent and registrar.

348.   Accordingly, Defendant VStock was in a fiduciary relationship with and had fiduciary duties to Znergy-Mazzal.

349.   In connection with the share transfers required by the SP Agreement and concerning which the Lawyer Defendants, as Escrow Agent for all of the parties to the SP Agreement transaction (including without limitation Znergy-Mazzal), and as Znergy-Mazzal's legal counsel, had requested verification of the adequacy of transfer documentation submitted to it.

350.   Defendant VStock's fiduciary duties to Znergy-Mazzal included, without limitation:

 (A) the duties of due care, due diligence, and loyalty, and thus, *inter alia*, in this context: (i) to provide accurate information about the transfer documents submitted to it;  and (ii)   the duty not to register or effectuate any transfer that would contradict the transfers that it knew were contracted with its issuer client, Znergy-Mazzal, and its shareholder, B2, for which it knew the Escrow Agent, Znergy-Mazzal and B2 (through the Lawyer Defendants) were relying on VStock to verify the adequacy of the documentation to effectuate the contracted transfers; and

 (B)  the duty to timely and fully disclose to its client, Znergy-Mazzal, directly or through its counsel and Escrow Agent (the Lawyer Defendants) that Defendant VStock had received and processed transfer requests the preceding business day in contradiction of a part of the transfers for which it was asked by the Lawyer Defendants to verify the adequacy of the transfer documentation.

351.   Defendant VStock breached its fiduciary duties to Znergy-Mazzal, including without limitation by:

(A) providing false information to the Escrow Agent about the adequacy of transfer documentation received by it, including without limitation that Defendant VStock had all necessary paperwork (which under the SP Agreement included that needed for the transfer of the Free-Trading Telsi Shares and all of the Trabelsi Shares), while knowing or reasonably expecting that the Escrow Agent, Znergy-Mazzal and Plaintiff B2 would rely upon such information;

(B) if VStock had any question about for which transfers it was asked to confirm it had all necessary documents, failing to seek clarification or a detailed list or copy of what documents VStock should have received;

(C) failing to disclose by February 8, 2016, Defendant VStock's awareness of having received documentation and processed or processing transfers on or effective as of the preceding business day, February 5, 2016, requested by Defendant Trabelsi, individually and in the name of "Shawn Telsi", that were inconsistent with the transfers for which it was being asked to verify the adequacy of the documentation on February 8, 2016; and

(D) attempting to cover up Defendant VStock's prior actions and omissions by failing to provide Znergy-Mazzal (or B2), directly or through the Lawyer Defendants, with copies of such inconsistent documentation on February 8, 2016, when verifying that VStock had all necessary paperwork (through Joe Donohue's Febraury 8, 2016 e-mail) and in responding to inquiries by the Lawyer Defendants; and

(E) failing to keep copies of all of the documents that it had received from Defendant Trabelsi, in his name or the name of "Shawn Telsi".

352.   Defendant VStock breached its fiduciary duties to Plaintiff Znergy-Mazzal, and such breaches directly, foreseeably and proximately caused economic damages to Znergy-Mazzal.

353    Plaintiff B2, as Assignee of Znergy-Mazzal's claims and causes of action, hereby

sues Defendant VStock for breach of fiduciary duty and all recoverable damages caused thereby.

**COUNT XIX:**
**Plaintiff B2's Breach of Fiduciary Duty**
**Claim Against Defendant VStock**

354.   Paragraphs 1 through 353 above are incorporated herein by reference as if fully

restated in this Count.

355.   At relevant times in February 2016 through at least June 2016, Defendant VStock

had fiduciary duties to Plaintiff B2, because, among other reasons: (A) Plaintiff B2 was an

existing shareholder purchasing, and needing and reasonably expecting the registration of

transfers of, the Free-Trading Telsi Shares; (B) Defendant VStock was asked by the Lawyer

Defendants and agreed to verify that the documentation necessary to accomplish and register te

SP Agreement sale and transfer transactions had been provided by Defendant Trabelsi;

(C) Defendant VStock directly advised Plaintiff B2, through Peterson, on February 3, 2016

concerning holding free-trading stock in connection with the impending SP Agreement

transaction; (D) as a shareholder seeking registration of a transfer of stock in Znergy-Mazzal,

Plaintiff B2 was a third party beneficiary of Defendant VStock's contractual relationship with its

client issuer, Znergy-Mazzal; and (E) pursuant to Comment 1 to Section 8-407 of the Uniform

Commercial Code.

356.   Defendant VStock's fiduciary obligations to Plaintiff B2 included, without limitation,

the duties described in paragraph 350(A) and (B) as VStock's duties to Znergy-Mazzal.

357.   Defendant VStock breached its fiduciary duties to Plaintiff B2, including without

limitation by: (A) the breaches described in paragraph 351(A)-(E) above; and (B) attempting to

cover up Defendant VStock's prior actions and omissions by giving inaccurate information to

Plaintiff B2 about what documents it had received from Defendant Trabelsi, and then failing to keep copies of all of the documents that it had received from Defendant Trabels.

358.   Defendant VStock breached its fiduciary duties to Plaintiff B2 and thereby caused directly, foreseeably and proximately economic damages to Plaintiff B2.

359.   Plaintiff B2 hereby sues Defendant VStock for breach of fiduciary duty and all recoverable damages caused by Defendant VStock's breaches.

## COUNT XX:
### Plaintiff B2, Assignee's Claim for Gross Negligence
### Against Defendant VStock

360.   Paragraphs 1 through 359 above are incorporated by reference as if fully restated in this Count.

362.   Defendant VStock had the duties of a transfer agent and registrar to Plaintiff Znergy-Mazzal in February 2016 and thereafter.

363.   Defendant VStock's conduct (and performance of its duties under the Transfer Agent and Registrar Agreement with Znergy-Mazzal) fell below the standard of care and performance of an average transfer agent and registrar acting with normal due diligence and loyalty in the performance of its functions, and the deficiency was extreme and outrageous.

364.   Defendant VStock failed to exercise even slight care, scant care, or slight diligence, and Defendant VStock's actions and omissions evinced a conscious and reckless disregard for the rights of Znergy-Mazzal, its client, and utter forgetfulness of legal obligations so far as Znergy-Mazzal was concerned.

365.   Defendant VStock was grossly negligent in its actions and omissions as Znergy-Mazzal's transfer agent and registrar, and such gross negligence directly, foreseeably and proximately caused Znergy-Mazzal economic damages.

366.  Plaintiff Znergy-Mazzal hereby sues Defendant VStock for gross negligence and for all recoverable damages caused thereby.

## COUNT XXI:

### Plaintiff B2's Claim for Gross Negligence
### Against Defendant VStock

367.    Paragraphs 1 through 366 above are incorporated by reference as if fully restated in this Count.

368.    Defendant VStock had the duties of a transfer agent to Plaintiff B2 as a shareholder and an entity that paid to acquire and for the registration of transfer of additional shares of stock in Znergy-Mazzal, Defendant VStock's client issuer and for the reasons described in paragraph 355 above.

369.  Defendant VStock's duties to Plaintiff B2, in connection with the SP Agreement transaction, included the duties described in paragraph 356 above.

370.  Defendant VStock breached its duties to Plaintiff B2 as described in paragraph 357 above.

371.  Defendant VStock's performance fell beneath the standard of care of an average transfer agent in the same or similar circumstances, and the deficiency was egregious, reckless, and characterized by an absence of even slight diligence and a want of even scant care.

372.  Defendant VStock performed and failed to perform its duties to Plaintiff B2 with a conscious and reckless disregard for, an utter indifference to and utter forgetfulness of its legal obligations, Plaintiff B2's rights, and the consequences to Plaintiff B2 of VStock's disregard of its duties and breach of the standard of care.

373.  Defendant VStock committed gross negligence and thereby proximately, directly and foreseeably caused damages to Plaintiff B2, which now sues Defendant VStock.

**Count XXIII:**
**Plaintiff B2's Request for Injunctive Relief**

374.  Paragraphs 1 through 373 are incorporated herein by reference as if fully restated in this Count.

375.  In Section 6.13 of the SP Agreement, each Party [including Defendant Trabelsi, the Mazzal Trust and "Shawn Telsi"] agreed that the "other Parties [including Plaintiff B2 and Znergy-Mazzal]  would be damaged irreparably and would have no adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or otherwise is breached…[and] will be entitled to an injunction to prevent any breach of…and to enforce specifically any provision of this Agreement, in addition to any other remedy…"

376.  Additionally, if the injunction requested hereinbelow is not granted against the subject Defendants, there is a substantial risk of immediate and irreparable harm by Defendants' concealment or dissipation of the assets subject to Plaintiff B2's claims herein, directly and as Assignee-including without limitation the unsold portion of the Free-Trading Telsi Shares, the proceeds of sales of any Free-Trading Telsi Shares by or at the direction of Defendant Trabelsi, and the Property- and of Defendants' destruction or alteration of records demonstrating the course of record ownership and sale of the Free-Trading Telsi Shares, and the amount and recipient of the sale proceeds that properly belong to Plaintiff B2.

377. Accordingly, Plaintiff B2, directly and as Assignee of Znergy-Mazzal's claims and causes of action, is entitled to the issuance of a preliminary and permanent injunction under Section 6.13 of the SP Agreement and under Fed.R.Civ.P. 65, prohibiting and enjoining:

(A) Defendants Trabelsi (whether acting in his name, in the name or as agent for "Shawn Telsi" or any family member, as trustee of The Mazzal Trust, The Bany's Living Trust, or any other trust, or as member, manager, officer, director or owner of any limited liability company,

corporation or other entity), Aliza Trabelsi, (individually, as trustee of The Bany's Living Trust or any other trust, or as a member, manager, officer, director, or owner of any limited liability company, corporation or other entity), Mazzal Holding Corp., a Massachusetts corporation,  and Magnolia Road LLC (all of the foregoing are collectively called the "PI Defendants") and

(B) all of the PI Defendants' respective officers, agents, servants, employees and attorneys, and

(C) all other persons who are in active concert or participation with any of the PI Defendants or any such other persons or entities listed in the immediately preceding Clause (B), from doing or attempting to do any of the following until further Order of the Court:

1)  Selling, transferring, assigning, exchanging, loaning, pledging, gifting, encumbering, or otherwise disposing of any shares of stock in Znergy, Inc., f/k/a Mazzal Holding Corp., a Nevada corporation;

2)  Transferring, assigning, exchanging, loaning, gifting, spending, encumbering or otherwise disposing of, concealing or hiding any cash, securities or other proceeds of the sale, exchange, pledge or other disposition of any shares of stock of Znergy, Inc., f/k/a Mazzal Holding Corp., a Nevada corporation, that occurred at any time on or after February 5, 2016;

3)  Deeding, conveying, transferring, assigning, exchanging, mortgaging, gifting, encumbering, or otherwise disposing of any interest in the Property, described as 165R and 171 Hart St., Taunton, Massachusetts, comprising approximately 25 acres, and more specifically described as follows:

   the land in Taunton, Bristol County, Massachusetts on the southerly side of Hart Street, being Lot 2 as shown on a plan entitled, "Plan of Land in Taunton, Massachusetts, owned by Gloria S. Paolella, scale 1"=100 feet dated August 30, 1995, rev. 9-7-95, by Haywood Boyton and Williams, Inc. surveyors civil engineers, 60 Court St., Taunton, MA which plan is recorded with Bristol County

Northern District Registry of Deeds in Plan Book 349, Page 31, and to which plan reference is made for a more particular description of said premises;

or

4)   Shredding, concealing, hiding, deleting, destroying, or altering any e-mails or other records or documentation of or related to the ownership, purchase, sale, transfer, re-certification or re-titling, exchange, pledge, encumbrance or other disposition of any shares of stock of Znergy, Inc. f/k/a Mazzal Holding Corp., that have ever been owned, held, transferred, directed, re-titled, purchased, exchanged, or sold by, or in the name or for the benefit of, Shawn Telsi, Nissim Trabelsi, Nissim S. Trabelsi, The Mazzal Trust, The Bany's Living Trust, any sibling of Nissim Trabelsi, any trust of which any of the foregoing is or has been a trustee or beneficiary, or any entity of which any of the foregoing persons is or was an officer, director or manager.

378.   Additionally, due to the penchant of the PI Defendants for creating fraudulent documents such as the Fake Deed, using at least one acknowledged alias in signing documents, and providing contradictory stories about what Defendant Trabelsi, a/k/a Shawn Telsi has done with the Free-Trading Telsi Shares after receiving full payment from Plaintiff B2 for them, and the suppression of the OTC Market value of Znergy-Mazzal stock occurring due to sale of the Free-Trading Telsi Shares, Plaintiff B2 requests a mandatory preliminary injunction against the Injunction Defendants requiring them to provide, no later than 10 days after this Court's Order, a sworn statement from Defendant Trabelsi under pains and penalties of perjury identifying and quantifying:

(I)  every sale, transfer, gift, exchange or other disposition of any free-trading shares of stock of Znergy, Inc., f/k/a Mazzal Holding Corp., that he has, directly or in the name of Shawn Telsi or anyone else, directed, requested, ordered or caused to be made, for himself or for or as

agent of "Shawn Telsi" for which Defendant Trabelsi, in his or any other name, title or capacity, directly or through any agent, street name holder, broker, fund, investment adviser, trust of which he or his wife or any of his children is or has been a trustee or beneficiary, any company of which he is or has been an officer, director, owner or manager, or otherwise, or for which Defendant Trabelsi, in any of the capacities or acting through any of the above-referenced persons or entities;

(II)  all cash proceeds or other consideration, whether stock, options, agreements to provide future consideration, loans, grants of credit, real estate, or otherwise, at any time since February 5, 2016, that Defendant Trabelsi, whether as himself, "Shawn Telsi", or in any other name, or through any person or entity described in clause (I) above, has received resulting from any sale, exchange, gift or other transfer of any free-trading shares of Znergy, Inc., f/k/a Mazzal Holding Corp., through the over-the-counter market or otherwise, and the amount, disposition and current location of all proceeds of any such sale or other disposition; and

(III)  all shares of stock of Znergy, Inc. f/k/a Mazzal Holding Corp. that are owned, held or controlled by Defendant Trabelsi as of the date of this Complaint, whether in his own name, the name of Shawn Telsi, or the name of anyone else for whom Defendant Trabelsi has or has exercised agency, a/k/a, direction, control or representative authority, including without limitation any person or entity listed in clause (I) above.

## COMPLAINT VERIFICATION

I, Peter M. Peterson, hereby declare under the pains and penalties of perjury that I am the

Managing Member of Plaintiff B2 Opportunity Fund, LLC, that I have reviewed paragraphs 2

through 191 of the Complaint to which this Verification is attached, that I have personal

knowledge of the factual statements contained therein, and that the factual statements contained

therein are true and correct to the best of my knowledge and belief, subject to the following

clarifications: (a) where a statement is made on information and belief, it references information

that I believe to be true based on the facts, circumstances and documents described in this

Complaint; (b) where a defendant party's motive or state of mind is referenced, I believe that

reference to be accurate based on the facts, circumstances and documents described in this

Complaint and my participation in them, but I do not claim to have read the person's mind; (c)

except where noted to the contrary, I have assumed that signatures on filings contained in

government records are genuine and that the facts stated in those records as to entity formations

and pertinent persons' names and titles are accurate; and (d) I have relied on certain records

obtained or received by Plaintiff B2 Opportunity Fund, LLC from other sources for the truth of

certain facts that are documented by those records.

SIGNED AND SWORN UNDER THE PAINS AND PENALTIES OF PERJURY THIS 9th

DAY OF JANUARY 2017.

Peter M. Peterson, Managing Member of
Plaintiff B2 Opportunity Fund, LLC

<u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff B2 Opportunity Fund, LLC, directly and as Assignee of Znergy, Inc., f/k/a Mazzal Holding Corp., respectfully requests that this Honorable Court:

A.      Enter judgment in favor of Plaintiff B2, directly and as Assignee, on all counts that seek damages, in amounts to be determined at trial;

B.      Award Plaintiff B2 double or treble damages under G.L. c. 93A;

C.      Award Plaintiff B2 its reasonable and necessary attorney's fees;

D.      Award Plaintiff B2 all of its litigation costs, expenses, and fees, including without limitation expert fees, incurred in connection with this matter;

E.      Award Plaintiff B2 the temporary and permanent injunctive relief and other equitable relief sought herein;

F.      Enter the declaratory judgments requested by Plaintiff B2 herein;

G.      Enforce the specific performance of contractual obligations requested by Plaintiff B2 herein;

H.      Award Plaintiff B2 all applicable pre-judgment and post-judgment interest; and

I.      Grant such other relief to Plaintiff B2 that this Court may deem fair and just.

<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs respectfully demand a trial by jury of all causes of action so triable.

Dated:  January 9, 2017.

Respectfully submitted,

PLAINTIFF B2 OPPORTUNITY FUND, LLC,
DIRECTLY AND AS ASSIGNEE OF
ZNERGY, INC., F/K/A MAZZAL HOLDING
CORP.

By its counsel,

NEELON, ANDREWS & LEVIN, LLC
35 Braintree Hill Office Park, Suite 201
Braintree, MA 02184
Ph: (781) 590-2000
Fax:(781) 817-4434


By: /s/Daniel P. Neelon
      Daniel P. Neelon, Esq., BBO # 565624
      dneelon@bostonilg.com

      /s/Caroline Schmittdiel
      Caroline Schmittdiel, Esq., BBO # 682935
      cbs@bostonilg.com