UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-10043-RGS

B2 OPPORTUNITY FUND, LLC

v.

NISSIM TRABELSI ET AL.

MEMORANDUM AND ORDER ON
MOTION TO DISMISS BY DEFENDANTS
C. PARKINSON LLOYD AND KIRTON MCCONKIE, P.C.

August 28, 2017

STEARNS, D.J.

Defendants C. Parkinson Lloyd, a Utah attorney, and Kirton McConkie, P.C., Lloyd's Utah law firm, jointly move to dismiss this lawsuit brought by B2 Opportunity Fund, LLC. Defendants contend that this court lacks personal jurisdiction. For the following reasons, the court will allow the motion.

BACKGROUND

The following facts are taken from the Amended Complaint and an affidavit from Lloyd. Lloyd practices law in Utah. In January of 2013, he began representing a company called Boston Investment and Development Corp. (BIDC), a Nevada corporation headquartered in Massachusetts and led by Nissim Trabelsi, a Massachusetts resident. In December of 2013, Lloyd

moved from his previous law firm to Kirton McConkie (KM), also based in Utah. He brought BIDC with him as a client. In February of 2014, BIDC changed its name to Mazzal Holding Corp. Trabelsi continued as the president and CEO of the rechristened company. Invoices for the legal services provided by Lloyd and KM to Mazzal were mailed to either Israel or Massachusetts.

In the summer of 2015, Trabelsi told Lloyd that he was interested in selling Mazzal. In August of that year, Lloyd spoke with Peter Peterson, the managing member of B2. When Peterson expressed interest in purchasing a publicly traded company, Lloyd mentioned that he had a client who had such a company to sell. On August 18, 2015, Lloyd told Peterson that Mazzal was still on the market and offered to introduce Peterson to Trabelsi. On September 10, 2015, Lloyd emailed Trabelsi and Peterson to make the mutual introduction.

Lloyd remained involved as Trabelsi and Peterson negotiated several complex transactions. The transaction at issue began to take shape when Peterson contacted Lloyd in mid-November of 2015 to express an interest in purchasing Trabelsi's shares in Mazzal. Lloyd communicated this to Trabelsi. Subsequently, Lloyd drafted and revised a term sheet and provided comments on a letter of intent. To enable Trabelsi to complete some of the

terms of the deal, he assisted the filing of Mazzal's 10-Q report for the third quarter of 2015. Lloyd drafted and circulated to the parties a draft stock purchase agreement and an escrow agreement, and then followed up with emails and amended documents, as needed, through the closing of the deal on February 5, 2016.

The transaction proved ill-fated. The finalized stock purchase agreement (SPA) called for Trabelsi to transfer 45.8 million restricted shares and 9.5 million "free-trading shares" held by a "Shawn Telsi," who Trabelsi held out to be his brother-in-law. B2 alleges that Telsi was merely an alias for Trabelsi, and that the alias was instrumental in Trabelsi's alleged fraud: Trabelsi transferred 9.5 million of the 45.8 million restricted shares into Telsi's name, and then transferred those shares to B2, while representing them as the free-trading shares. Trabelsi afterwards sold a substantial number of the free-trading shares in the open market.

The parties to the SPA — B2, Mazzal, and Trabelsi/Telsi— also entered into an escrow agreement appointing KM (and, by extension, Lloyd) as the escrow agent for the transaction. In that capacity, KM held $315,000 in a Utah escrow account. The funds were to be released to Trabelsi after KM either received all of the shares covered by the agreement or was "informed by VStock Transfer, LLC, [Mazzal]'s Transfer Agent . . . that the [shares] have

3

been returned to the Transfer Agent for transfer to the Buyer." In response to an email from Lloyd, a VStock representative reported on February 8, 2016 that "it appears we have all necessary paperwork to process" the stock transaction. Lloyd and KM transferred the escrow funds to Trabelsi the same day. B2 alleges that VStock never possessed the requisite documents, and that Lloyd and KM failed to take steps to confirm that Trabelsi had provided the correct type of shares and accompanying documentation to VStock. This failure, B2 says, amounted to a breach of the escrow agreement, breach of fiduciary duty, and gross negligence to boot. In addition, B2 contends that Lloyd and KM effectively represented both sides to the SPA.[1]

Lloyd and KM moved to dismiss, asserting that this court lacks personal jurisdiction. Shortly thereafter, B2 filed its Amended Complaint as of right, and Lloyd and KM responded by again moving to dismiss for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2).

DISCUSSION

The parties open with a skirmish about the relationship between the SPA and the escrow agreement. B2 asserts that Lloyd and KM are bound by

---

[1] B2 brings this suit on its own behalf and as the assignee of claims held by Mazzal (now known as Znergy, Inc). The Amended Complaint therefore contains two claims each for breach of fiduciary duty (Counts VII and VIII) and gross negligence (Counts IX and X). B2 alone asserts the breach of contract claim (Count XVI).

4

the SPA's choice of forum and its recital of a consent to jurisdiction in Massachusetts. B2 points out that the SPA specifically provides that "[e]ach party . . . consents to the personal jurisdiction of any state or federal court located in Suffolk County, Massachusetts . . . in any proceeding arising out of or relating to any transaction document." Dkt 77-2, ¶ 6.6. The opening paragraph of the SPA defines "parties" and "party" as including Nissim Trabelsi, Shawn Telsi, the Mazzal Trust, and B2. *Id.* at 1. The problem posed by this definition for B2 is obvious: although the SPA provides that each "party" to the SPA consents to jurisdiction in Massachusetts, the term "party" does not include Lloyd or KM. The escrow agreement, which is unquestionably binding on Lloyd and KM, contains no consent to jurisdiction.

B2 attempts to overcome this hurdle by arguing that the escrow agreement and SPA must be read as an integrated whole, and that Lloyd and KM are thus bound by the SPA's consent to jurisdiction provision. As the escrow agreement specifies Utah as the choice of law, and B2 does not contest its validity or applicability, the court will apply Utah law.[2] *See Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017).

---

[2] B2 cites both Utah and Massachusetts law, but its surreply relies chiefly on Utah law, and at oral argument it did not contest the assertion that Utah law governs. In any event, B2 has provided no argument for why

Under Utah law, the interpretation of the terms of a contract is a question of law. *McNeil Eng'g & Land Surveying, LLC v. Bennett*, 268 P.3d 854, 857 (Utah Ct. App. 2011). The court must "look[] to the contract's four corners to determine the parties' intentions, which are controlling." *Bakowski v. Mtn. States Steel, Inc.*, 52 P.3d 1179, 1184 (Utah 2002). In ascertaining intent, as B2 argues, two agreements "executed substantially contemporaneously and . . . clearly interrelated . . . must be construed as a whole and harmonized." *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987). This interpretive principle has force where, as here, it would be nonsensical to give identical terms in the SPA and the escrow agreement — such as "Trabelsi Shares" or "Telsi Shares" — different meanings. But in most circumstances this aphorism is an interpretive principle, not a rule altering the contractual obligations of non-parties. *See, e.g.*, *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1165 (9th Cir. 1996). It is therefore unsurprising that B2 points to no Utah case in which this rule has been invoked to hold a party to one agreement to the terms of a second agreement to which it is not a party. Instead, Utah cases import terms from one agreement into a separate agreement where both parties have signed the

---

Massachusetts would not honor the escrow agreement's choice of law clause. *See Taylor v. E. Connection Operating, Inc.*, 465 Mass. 191, 195-196 (2013).

relevant agreements, *see, e.g.*, *Shields v. Harris*, 934 P.2d 653, 657 (Utah Ct. App. 1997), or where a "clear and unequivocal" incorporation by reference has occurred, *Consol. Realty Grp. v. Sizzling Platter, Inc.*, 930 P.2d 268, 273 (Utah Ct. App. 1996) (quoting *Interwest Constr. v. Palmer*, 886 P.2d 92, 97 n.8 (Utah Ct. App. 1994)). No incorporation of the jurisdictional provision with the "degree of specificity" required by Utah law, *Hous. Auth. of Cty. of Salt Lake v. Snyder*, 44 P.3d 724, 729 (Utah 2002), occurred here.[3]

B2 musters one additional argument in an effort to apply the terms of the SPA to Lloyd and KM. It points to the SPA's specification that "[e]ach party" waives any objections to venue or forum non conveniens and "agrees

---

[3] The result would be the same under Massachusetts law. Massachusetts courts have occasionally held that a contract's terms can bind nonparties under the "read together" rule, but in circumstances wholly unlike those here. In *Chase Commercial Corp. v. Owen*, 32 Mass. App. Ct. 248 (1992), a bank and a corporation entered into a loan agreement that provided that two of the company's principals would guarantee the debt. *Id.* at 249. The loan agreement included a jury waiver clause. *Id.* The principals and the bank entered into a separate guarantee agreement which did not include the jury waiver clause. *Id.* Relying on cases involving sureties and guarantors, the Appeals Court concluded that the jury waiver clause bound the principals as well because the various "documents were part of one transaction and were . . . to be read together," the bank sought "personal guarantees because [the defendants] were the principals of the corporation borrowing money," and "[t]he defendants were the ones who negotiated the loan on behalf of [the corporation], and they could easily monitor and control" performance. *Id.* at 251. Nothing comparable occurred here: Lloyd and KM are not guarantors, did not negotiate the terms of the SPA, and could not control the performance contemplated by the SPA.

not to initiate any proceeding arising out of or relating to any transaction document (unless otherwise stated to the contrary in any transaction document) in any other court or forum." Dkt 77-2 ¶ 6.6. The term "transaction document" is likewise defined: "[A]ny other required documents or agreements . . . to which [either Trabelsi or Telsi] is a party." *Id.* ¶ 2.1. These provisions, B2 contends, bar it from bringing suit against Lloyd and KM in any other forum, as its claims "aris[e] out of or relat[e] to" the escrow agreement, a "transaction document."

Once again, however, the provisions B2 identifies embody the agreement of "[e]ach party" to the SPA. *Id.* ¶ 6.6. Lloyd and KM are not parties to the SPA, either colloquially or in the manner in which the SPA defines that term. Consequently, the prohibition against suits in other fora does not bar B2 from suing Lloyd and KM elsewhere. Even if the provision were read (illogically) to apply to suits against nonparties, Lloyd and KM would lack standing to enforce it.[4] *See Cumis Ins. Soc., Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 464 (2009) ("That the plaintiffs derive a benefit

---

[4] B2 has an additional layer of protection: Lloyd and KM would likely be judicially estopped from relying on the terms of the SPA in raising a jurisdictional challenge to B2's suit in another forum, given the position they have taken regarding the applicability of the key provisions of the SPA here. *See generally Perry v. Blum*, 629 F.3d 1, 8-9 (1st Cir. 2010) (describing elements of judicial estoppel).

from a contract between others does not make them intended third-party beneficiaries and does not give them the right to enforce that agreement," and an "express[] and unambiguous[]" exclusion of third-party beneficiaries will be honored); *Sullivan v. Kondaur Capital Corp.*, 85 Mass. App. Ct. 202, 206 (2014) ("[A] nonparty who does not benefit from a contract generally is without standing to enforce rights under it.").

With the contractual niceties put to the side, the court must turn to the more pertinent question of personal jurisdiction. It is the plaintiff's burden to demonstrate that personal jurisdiction exists. *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007). District courts may employ any of several methods to evaluate the adequacy of a plaintiff's proof. *See Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675-678 (1st Cir. 1992). As the parties have expressed no preference among methods, the court will employ the most common: the "prima facie" approach. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002). Under this approach, the court does not engage in factfinding, but instead examines whether the plaintiff has provided "evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016). The court will thus "'accept the plaintiff's (properly documented) evidentiary

proffers as true,' and construe those facts 'in the light most congenial to the plaintiff's jurisdictional claim.'" *Hannon v. Beard*, 524 F.3d 275, 279 (1st Cir. 2008) (quoting *Daynard*, 290 F.3d at 51). The court also considers uncontradicted facts put forward by the defendants. *Daynard*, 290 F.3d at 51.

B2 must demonstrate that the exercise of personal jurisdiction over Lloyd and KM meets the requirements of both the Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment. *See Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015). Although for the most part these two requirements overlap, some daylight can be found between the two. *See id.* Here, however, the court can bypass the long-arm statute, as no personal jurisdiction exists under the constitutional standard.

"In order for a . . . court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'" *Bristol-Myers Squibb Co. v. Superior Ct. of Calif.*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014)) (emphasis omitted). To satisfy this standard, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). Thus, "specific jurisdiction is confined to adjudication of issues arising from, or connected with, the very

controversy that establishes jurisdiction." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Courts employ a three-part approach when analyzing specific jurisdiction, asking "(1) whether the claim 'directly arise[s] out of, or relate[s] to, the defendant's forum state activities;' (2) whether the defendant's in-state contacts 'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable;' and (3) whether the exercise of jurisdiction is reasonable." *Baskin-Robbins*, 825 F.3d at 35 (quoting *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 65 (1st Cir. 2014)). All three elements of the test must be met in order to establish personal jurisdiction. *Id.*

At the outset, B2 faces an uphill climb. Courts have generally been unwilling to find that out-of-state attorneys are subject to personal jurisdiction in the state where a client is located, at least where the legal services at issue occurred outside of that state. *See Newsome v. Gallacher*, 722 F.3d 1257, 1280-1281 (10th Cir. 2013) (collecting cases and joining the majority view "that an out-of-state attorney working from out-of-state on an

11

out-of-state matter does not purposefully avail himself of the client's home forum's laws and privileges"); *see also Companion Prop. & Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 560 (5th Cir. 2013); *Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 226-227 (8th Cir. 1987). The First Circuit is no exception to this rule. *See Sawtelle v. Farrell*, 70 F.3d 1381 (1st Cir. 1995).

B2 first must demonstrate that the claims it has against Lloyd and KM arise out of or relate to Lloyd and KM's contacts with Massachusetts. Emphasizing that this is a "flexible, relaxed standard," *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994), B2 points to several facts in an attempt to establish relatedness: 1) emails between Lloyd and Trabelsi, known to be a Massachusetts resident; 2) invoicing Mazzal in Massachusetts; 3) effecting the introduction between Trabelsi and Peterson that led to the transaction; 4) drafting the relevant documents for the deal; and 5) wiring the $315,000 purchase price to a Massachusetts bank account.

These contacts, however, are weaker than those facing the First Circuit in *Sawtelle*. There, two New Hampshire residents brought suit against their attorneys, alleging malpractice in the handling of a wrongful death settlement in a court in Florida. The attorneys — one based in Virginia, and the other in Florida — successfully moved to dismiss for lack of personal jurisdiction. The attorneys' contacts with New Hampshire consisted of

phone calls with their clients and "numerous letters" addressed to the plaintiffs in New Hampshire. *Id.* at 1386.

The First Circuit viewed the plaintiffs' argument on the "arising out of" element of the personal jurisdiction test "as tenuous at best." *Id.* at 1391. It observed that among all the phone calls and letters, only two were relevant to the claims: the Virginia attorney's letter stating "that he believed it to be in the [plaintiffs]' best interests to accept the . . . settlement offer," and the Florida attorney's "telephone call to New Hampshire in which he concurred in the settlement recommendation." *Id.* at 1389. The court made two related observations about these contacts. First, it noted that the alleged negligence occurred almost entirely out of state — specifically, the lawyers' investigation of the claims in Florida and Virginia. *Id.* at 1390. Second, it concluded that the fact that the attorneys "directed negligent settlement advice into New Hampshire" did not alter this conclusion: "[t]he communications sent into New Hampshire were ancillary to the allegedly negligent non-forum activities, and . . . those communications were the only relevant contacts with the forum for purposes of the . . . malpractice claim." *Id.* at 1390-1391.

This case tracks *Sawtelle* in several important respects. First, like the attorneys in *Sawtelle*, Lloyd and KM are not licensed to practice in Massachusetts, have no offices here, and never traveled to Massachusetts

13

during the representation. Second, all of Lloyd and KM's services were performed in Utah, and the alleged misconduct — negligence and breach of fiduciary duties in handling the escrow funds — occurred in Utah as well. *See Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289, 291 (1st Cir. 1999) ("A breach of fiduciary duty occurs where the fiduciary acts disloyally."). Third, the contacts at issue — emails and phone calls in the course of the attorney-client representation — are fundamentally indistinguishable from the contacts the First Circuit viewed as "tenuous" in *Sawtelle*. Moreover, the allegations here are a step removed even from the tenuous contacts that figured in *Sawtelle*. Two of the forum contacts in *Sawtelle* could be characterized as "ancillary to the allegedly negligent non-forum activities," because they were a continuation or completion of a course of negligent conduct. *Id.* at 1390. The same is not true of the allegations here — the alleged misconduct took place entirely in Utah, and none of the actions Lloyd and KM took under the escrow agreement bear any relation to the Massachusetts contacts B2 identifies.[5] Thus, B2's claims do not arise out of or relate to Lloyd and KM's forum contacts.

---

[5] Although the First Circuit has recommended analyzing relatedness separately for breach of contract and tort claims, *see Phillips Exeter Acad.*, 196 F.3d at 289, 291, there is nothing separate to analyze here: the breach of contract claim is pressed by B2 alone (not by Mazzal, the only Massachusetts party to the escrow agreement), and nothing indicates that Lloyd and KM's

14

B2 also fails to demonstrate that Lloyd and KM purposefully availed themselves of doing business in Massachusetts. Purposeful availment involves two subinquiries: voluntariness and foreseeability. *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 28 (1st Cir. 2008).

Lloyd and KM's contacts with Massachusetts were voluntary: they contracted to represent a company with its principal place of business in Massachusetts,[6] billing the company there at times, and knew Trabelsi was located in Massachusetts during that representation.

It is clear, however, that awareness of a party's presence in a particular forum "is not, on its own, enough to create personal jurisdiction over a defendant," *id.*; something more than simple awareness is required. Thus,

---

contacts with Massachusetts "were instrumental either in the formation of the contract or in its breach," *id.* at 289.

[6] Lloyd and KM suggest that Mazzal's principal place of business during the relevant period was Israel, where KM often sent invoices and which was listed as the company's principal executive office on some SEC filings. B2 points out that Mazzal's SEC filings during the relevant period sometimes listed a Massachusetts address. Beyond Trabelsi's alleged presence in Massachusetts during the relevant period, nothing beyond this evidence is adduced to determine where Mazzal's "nerve center" was located. *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010); *cf. id.* at 97 (concluding that SEC filings alone are insufficient to demonstrate principal place of business in response to a jurisdictional challenge). In keeping with the plaintiff-friendly approach of the prima facie test, *see Hannon*, 524 F.3d at 279, the court assumes that Mazzal's principal place of business was Massachusetts throughout the time of the events leading to this suit, and thus that Lloyd and KM represented a Massachusetts client.

"[t]he mere existence of an attorney-client relationship, unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over the non-resident in the forum state." *Sawtelle*, 70 F.3d at 1392. The foreseeability inquiry demands contacts such that a defendant could "reasonably anticipate being haled into court" in the forum. *Adelson*, 510 F.3d at 50 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). "A purpose of the foreseeability requirement is that 'personal jurisdiction over nonresidents . . . is a quid for a quo that consists of the state's extending protection or other services to the nonresident.'" *Phillips*, 530 F.3d at 29 (quoting *Sawtelle*, 70 F.3d at 1392).

Although it acknowledges *Sawtelle*'s conclusion that an attorney-client relationship, standing alone, is insufficient to demonstrate purposeful availment, B2 contends that jurisdiction in Massachusetts was reasonably foreseeable based on a familiar set of facts: because 1) Lloyd and KM represented Mazzal for an extended period of time for multiple issues; 2) the SPA, as drafted, included a Massachusetts choice of forum and choice of law clause; 3) Lloyd arranged an introduction for Peterson and Trabelsi; 4) Lloyd sent or received multiple emails related to the transaction; and 5) the money was transferred to a Massachusetts account.

At least three of these facts — Lloyd and KM's representation of Mazzal, the drafting of documents pursuant to that representation, and sending and receiving emails in the course of the representation — are part and parcel of any attorney-client relationship with an out-of-state client and do not make jurisdiction in the forum foreseeable. *See Sawtelle*, 70 F.3d at 1394; *see also Newsome*, 722 F.3d at 1280-1281. Although B2 places great stress on the fact that Lloyd arranged the initial contact between Peterson and Trabelsi, this, too, flowed from the already-existing attorney-client relationship, and Peterson apparently initiated the conversation about purchasing Mazzal.

Nor does Lloyd and KM's wiring of money to an account in Massachusetts suffice for foreseeability. The location of the bank account to which the funds were wired is precisely the sort of "random, fortuitous, or attenuated" contact that courts refuse to consider in the personal jurisdiction calculus. *Walden*, 134 S. Ct. at 1123 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). No other allegations suggest that Lloyd or KM "availed [themselves] of any of the protections of Massachusetts law or any other services provided by the state." *Phillips*, 530 F.3d at 29. Under the circumstances, Lloyd and KM have not purposefully availed themselves of the privilege of conducting business in Massachusetts.

ORDER

For the foregoing reasons, Lloyd and KM's motion to dismiss (Dkt #96) is <u>ALLOWED</u>.

         SO ORDERED.

         /s/ Richard G. Stearns

         _____
         UNITED STATES DISTRICT JUDGE