UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-10043-RGS

B2 OPPORTUNITY FUND, LLC

v.

NISSIM TRABELSI, ET AL.

MEMORANDUM AND ORDER ON
DEFENDANT VSTOCK TRANSFER, LLC's
MOTION TO DISMISS

October 18, 2017

STEARNS, D.J.

Defendant VStock Transfer, LLC (VStock), moves to dismiss a bucket full of claims brought by plaintiff B2 Opportunity Fund, LLC (B2), related to an ill-boded stock transaction. For the reasons that follow, the court will grant the motion.

BACKGROUND

VStock, a California limited liability company with a principal place of business in New York City, provides stock transfer services. In 2014, VStock was hired as a transfer agent by Mazzal Holding Corp., a Massachusetts-based company. In this capacity, VStock became entangled in the allegedly fraudulent transaction at issue. In early 2016, Mazzal's CEO, Nissim Trabelsi, entered into a Stock Purchase Agreement (SPA) in which he agreed

to sell 45.8 million restricted shares of Mazzal to B2. The SPA also promised that "Shawn Telsi" would sell to B2 9.5 million "free-trading" shares of Znergy-Mazzal stock. B2 alleges that Trabelsi held "Shawn Telsi" out to be his brother-in-law, when in fact that name was an alias for Trabelsi himself.

As negotiations on the SPA inched forward, the parties contacted VStock regarding the share transfers. On January 11, 2016, a VStock representative emailed instructions to Trabelsi explaining the mechanism for transferring shares from himself to another shareholder. Dkt #77-10 at 10. On January 27, 2016, Trabelsi emailed a request to Joseph Donohue (another VStock employee) to cancel certain shares of Mazzal being held in trust. Trabelsi emailed the same instruction to the escrow agent. The next day, the escrow agent emailed Donohue, introducing himself and asking Donohue to review the adequacy of some attached documentation to complete share transfers other than those contemplated in the SPA. *Id.* at 6.

The SPA was signed on February 4, 2016, and specified a closing date of February 5. The SPA specified that B2's payment for the shares was to be held in escrow until the promised shares were either delivered or the escrow agent was "informed by VStock" that the shares "have been returned to [VStock] for transfer to" B2 or its designee. An identical requirement appeared in the escrow agreement that accompanied the SPA. On February

4, the escrow agent emailed Trabelsi, copying B2 (but not VStock), with copies of transfer forms for the shares covered by the SPA and instructions for completing the transfers. Am. Compl. ¶¶ 79-80; Dkt # 77-9.

On February 8, Trabelsi sent emails to B2's managing member, the escrow agent, and Donohue, stating that on February 5 he had mailed VStock an envelope containing certain documentation: "transfer 9.5 million in stocks from interactive brokerage," "transfer from Shawn to new member," "transfer from Shawn to a new member," "transfer from Nissim Trabelsi to new member," and "cancelling the stocks from the trust." Dkt # 77-10 at 3. Later on the morning of February 8, the escrow agent emailed Donohue asking if the package contained "all you need to complete those transfers of the shares from Nissin [sic] and Shawn Telsi and to cancel the shares owned by the Trust?" *Id.* Donohue replied that afternoon that he had "received the paperwork about a half hour ago and it appears we have all necessary paperwork to process now all we need is confirmation from Nissim to continue with [the] transaction." *Id.* at 1. Relying on this statement, the escrow agent released the funds to Trabelsi.

Unfortunately for B2, the transactions envisioned by the SPA were never finalized because Trabelsi had not sent all of the required paperwork. As a result, the transactions VStock processed came up short. On February

3

5, 2016, it recorded a transfer of 9.5 million restricted Znergy-Mazzal shares from Trabelsi to Telsi. Dkt # 77-11. Several weeks later, on February 26, it received instructions from Trabelsi to transfer these same 9.5 million shares from Telsi to B2's designees. Am. Compl. ¶ 92. B2 alleges that this was a central element of the alleged scheme — this transaction made it appear as if B2 was receiving the promised free-trading shares from Telsi, when in fact it was receiving restricted shares. In March of 2016, B2 discovered the bait and switch, and, through the escrow agent, made demands on Trabelsi and Telsi for the transfer of the free-trading shares. These shares were never delivered; the only additional transfer, recorded in April, sent Trabelsi's remaining restricted shares to one of B2's designees. *Id.* ¶ 148.

In June of 2016, B2 asked VStock for copies of the documents that Trabelsi had provided VStock in February. Donohue initially replied that VStock had received "no formal paperwork," but only "emailed instructions." Dkt # 77-14. When B2 pointed to Donohue's prior assertion that he had received the "necessary paperwork," Donohue responded that VStock had returned "all originals" to Trabelsi, and the only form it retained from the February transaction was the withdrawal form transferring 9.5 million shares from a Telsi account at "Interactive Brokerage" to another Telsi account. Dkt # 77-15 at 1, 11.

4

B2 filed this lawsuit in January of 2017. As against VStock, B2 asserts claims for securities fraud (Count I), common-law fraud (Counts II and IV), conversion (Count VI), breach of fiduciary duty (Counts XVII and XVIII), gross negligence (Counts XIX and XX), and wrongful registration (Count XXI).[1] VStock has moved to dismiss, asserting that the court lacks personal jurisdiction over it and that, in any event, B2 has failed to state a viable claim against it. *See* Fed. R. Civ. P. 12(b)(2), (6).

## DISCUSSION

The court turns first to B2's securities fraud claim. If this claim survives, VStock's objections to personal jurisdiction go by the boards, as the Securities Exchange Act of 1934 provides for nationwide service of process. *See* 15 U.S.C. § 78aa(a); *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1086 n.6 (1st Cir. 1992).

To prevail on a claim under Section 10(b) of the Securities Exchange Act and its implementing Rule 10b-5, a plaintiff must establish "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss

---

[1] The common-law fraud, breach of fiduciary duty, and gross negligence claims are replicated because B2 brings them both on its own behalf and as the assignee of the claims held by Mazzal, now known as Znergy, Inc.

5

causation." *Miss. Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). VStock asserts that B2 has failed to adequately plead both scienter and loss causation.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). A defendant may also have the requisite mental state if he "acted with a high degree of recklessness." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002). "Recklessness, as used in this context, 'does not include ordinary negligence, but is closer to being a lesser form of intent.'" *Fire & Police Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 240 (1st Cir. 2015) (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 188 (1st Cir. 1999)). Thus, "a defendant can be held liable for 'a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011) (quoting *Greebel*, 194 F.3d at 198).

Allegations of scienter are subject to a heightened pleading standard under the Private Securities Litigation Reform Act of 1995 (PSLRA). *See*

*Greebel*, 194 F.3d at 195. Consequently, B2 must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The requisite "strong inference" exists where that inference is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). As this formulation implies, courts must evaluate "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.*

B2's claim against VStock rests on a single alleged misrepresentation: Donohue's statement that Trabelsi appeared to have sent "all necessary paperwork" for the transaction. This misrepresentation, B2 contends, led the escrow agent to release the funds to Trabelsi despite the fact that no shares had actually been transferred. B2's theory of the case is that Trabelsi and VStock were working "in tandem" to deceive B2 and effectuate the fraud, and that VStock's representation that it had "all necessary paperwork" was "knowingly incomplete, false, deceptive, and misleading." Pl.'s Opp'n at 5. Alternatively, B2 contends that VStock made this statement "with a high degree of recklessness knowing that it did not know and could not know whether it had all of the necessary documents without further inquiry, thus

presenting a danger of misleading . . . so obvious that VStock must have been aware of it." *Id.* at 24.

B2 offers two theories to support an inference of scienter. First, it argues that Donohue, VStock's representative, must have known the terms of the SPA, and therefore could not have possibly believed that whatever forms he received matched the transactions spelled out in the SPA. However, the allegation that Donohue knew the SPA's terms is made on information and belief, and B2 adds nothing to the mix that demonstrates that Donohue in fact possessed such knowledge.[2]

B2's second argument is somewhat more persuasive. It argues that Donohue should have known that whatever documents he received did not match the description of the four items that Trabelsi claimed to have sent. Evaluating this argument is complicated by the fact that it is not clear precisely what Trabelsi sent to Donohue. The parties are in agreement that Donohue received a form, dated February 5, 2016, that purported to transfer 9.5 million shares from Trabelsi's account at "Interactive Brokerage" into Telsi's name. That transaction matches the first item in Trabelsi's email — documentation to "transfer 9.5 million in stocks from interactive brokerage."

---

[2] Similarly, to the extent that B2 suggests that VStock was deliberately conspiring with Trabelsi to defraud B2, no facts have been plead that would make this allegation plausible, much less "cogent and compelling."

What (if any) other paperwork VStock received, particularly with respect to the other transfers Trabelsi described in his email, is unclear. From this, B2 argues, it can be inferred that if Donohue had examined the documents and then compared them to Trabelsi's email, he would have recognized that they did not match. Consequently, Donohue's statement was either knowingly false or made with reckless disregard as to its truth, supporting an inference of scienter.

Although this inference can perhaps be drawn, it competes with the more plausible inference that VStock was simply negligent. Under the transfer agreement with Mazzal, VStock was charged with carrying out transactions ordered by authorized Mazzal agents and supported by appropriate documentation. Trabelsi sent some indeterminate set of forms to VStock. Donohue's responsibility was to process whatever transfers were authorized by the documentation he was provided. Perhaps Donohue received only documentation permitting the Interactive Brokerage transfer, in which case his statement that he had "all necessary paperwork to process" that single "transaction" would be true; Donohue's failing would be in not raising concerns about the presumed discrepancy between Trabelsi's email and the paperwork that he received. If Donohue received other documentation for transactions that were not executed, his failing would

have stemmed from an incomplete understanding of the tasks he was expected to perform. Under either alternative, it is difficult to say that an intent to deceive or recklessness, rather than ordinary negligence, provides the more likely explanation for his acts or omissions.

Other aspects of the transaction make the inference of negligence the more cogent and compelling explanation. VStock is scarcely a "paradigmatic securities fraud defendant," namely "a corporate insider standing to profit from the sale of artificially inflated securities." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 66-67 (1st Cir. 2008). VStock is a transfer agent performing services for set fees. B2 has provided no reason to believe VStock's gain from the transaction would be more than nominal — indeed, the initial email from VStock to Trabelsi lists the total fees for the transactions Trabelsi described as at most $200. Dkt # 77-10 at 10. VStock's financial incentive to consciously defraud or act recklessly thus hardly compares with that of a typical defendant in a securities fraud case. No other motive has been suggested for VStock to engage in fraudulent behavior. Although B2 points out that "the absence of a motive allegation is not fatal" to a securities fraud claim, *Tellabs*, 551 U.S. at 325, it is a "relevant

consideration," *id.*, in evaluating the strength of an inference of scienter.[3] Taken together, these "characteristics . . . make it more difficult to infer a high degree of recklessness or an intent to defraud." *ACA*, 512 F.3d at 66.

At oral argument, B2 posited a variation of its first two arguments: that VStock, through Donohue – if it did not have advance notice of the terms of the SPA and did not realize at the time it made its representation that "it appears we have all necessary paperwork" – nonetheless acquired additional duties to correct this statement once Donohue discovered that the paperwork was, in fact, incomplete.[4] B2 raises this argument in response to VStock's contention that where a transfer agent performs merely "ministerial functions," it cannot be liable for securities fraud. *See Reyos v. United States,* 431 F.2d 1337, 1346 (10th Cir. 1970), *aff'd in part, rev'd in part, Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152 (1972) (no

---

[3] B2 suggests that VStock may have had an additional financial motivation because B2 had agreed as part of the SPA to pay approximately $5,000 in unpaid fees owed by Znergy-Mazzal to VStock. Whatever limited financial incentive this might have created is undermined by the fact that there is no allegation that VStock was aware of that aspect of the SPA.

[4] To the extent that any question of VStock's failure to correct its error about having "all the necessary paperwork" may also bear on the plaintiff's common-law fraud claim against VStock, the court takes no position on this issue, since the remaining state law claims will be dismissed for lack of personal jurisdiction. The court's discussion is therefore limited to what VStock's actions or omissions tell us about the plaintiff's allegations of scienter in the context of the securities fraud claim.

liability where defendant transfer agent "did no more than to perform ministerial functions required to carry out the transfer of the shares of stock"). Instead, B2 argues that VStock's affirmative representation to the escrow agent that it had "all the necessary paperwork" went beyond the mere ministerial duties of processing stock transfers, *see* Pl.'s Opp'n at 29, allowing for scienter to be imputed to the transfer agent.

The court is not convinced. This case is distinguishable from *Affiliated Ute Citizens*, where the transfer agents were found to be "active in encouraging a market" for the stock in question, had "solicit[ed] and accept[ed] standing orders" from other buyers, and had "received commissions and gratuities from the expectant" buyers. 406 U.S. at 152. There are no facts pled here that suggest that Donohue's, or VStock's, compensation depended on pushing through the share transfer without waiting for the proper paperwork, or that VStock took a more active role in the transaction beyond processing Trabelsi's instructions. *See Kenler v. Canal Nat'l Bank*, 489 F.2d 482, 485 (1st Cir. 1973) (noting the common law rule that "a transfer agent cannot be held liable to a stockholder in damages for mere nonfeasance"). The court ultimately concludes that even if the statement made by Donohue was negligent, B2 cannot rely on that statement

to support the conclusion that VStock was acting beyond its ministerial role as a transfer agent.

In a final volley, B2 points to the fact that "Trabelsi chose VStock to be Mazzal's transfer agent," and that "[d]iscovery could well show additional motivations and connections behind that choice that are not currently known to B2." Pl.'s Opp'n at 27 n. 13. Maybe so. However, B2 is not unique among plaintiffs in securities cases who suspect foul play and are frustrated by the lack of opportunity to take discovery to further investigate their hunches. The heightened pleading standards that apply under the PSLRA reflect a deliberate choice made by Congress to bar even some possibly meritorious claims from proceeding past the pleading stage. *See Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharm., Inc.*, 838 F.3d 76, 83 n.9 (1st Cir. 2016) (acknowledging that "prior to discovery, few plaintiffs will be in a position to make specific allegations about the form of internal documents" or discussions, but also noting that Congress has nonetheless "deliberately raised the entry bar to discovery . . . through the PSLRA's heightened pleading standards" (alteration in original) (quoting *Auto. Indus. Pension Trust Fund v. Textron, Inc.* 682 F.3d 34, 40 (1st Cir. 2012)).

Under the circumstances, the court concludes that B2 has failed to sufficiently plead scienter. The most cogent and compelling inference is that

VStock acted with "simple, or even inexcusable, negligence," not with a degree of recklessness "closer to a lesser form of intent." *Greebel*, 194 F.3d at 198, 199. The Section 10(b) claim will therefore be dismissed.[5]

VStock next challenges this court's jurisdiction over it for purposes of the remaining state-law claims. It is the plaintiff's burden to demonstrate that personal jurisdiction exists. *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007). District courts may employ any of several methods to evaluate the adequacy of a plaintiff's proof. *See Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675-678 (1st Cir. 1992). As the parties have expressed no preference among methods, the court will resort to the most common: the "prima facie"

---

[5] Even if B2 had adequately pled scienter, its claim would likely falter at the loss causation element, regardless of the applicable pleading standard. *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 239 n.6 (1st Cir. 2013) (noting uncertainty about the appropriate standard). A party must show a "sufficient connection" between the material false statement or omission and the loss, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014), or that the statement or omission was a "substantial cause" of its losses, *Mass. Ret. Sys.*, 716 F.3d at 239. Most circuits have viewed this requirement as embodying traditional principles of but-for and proximate causation, *see, e.g.*, *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1309 (11th Cir. 2011), and the First Circuit has implied that it sees things no differently, *see Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003) (observing in reviewing a securities fraud trial that the defendant's loss causation argument raised questions of "[p]roximate causation and intervening cause"). Here, two intervening causes threaten to break the causal chain: the nonfeasance of the escrow agent (who allegedly breached the escrow agreement by releasing funds before a contractual prerequisite was met) and Trabelsi's failure to abide by the terms of the SPA.

approach.  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002).  Under this approach, the court does not engage in factfinding, but instead examines whether the plaintiff has provided "evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction."  *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016).  The court will thus "'accept the plaintiff's (properly documented) evidentiary proffers as true,' and construe those facts 'in the light most congenial to the plaintiff's jurisdictional claim.'"  *Hannon v. Beard*, 524 F.3d 275, 279 (1st Cir. 2008) (quoting *Daynard*, 290 F.3d at 51).  The court also considers uncontested facts put forward by the defendant.  *Daynard*, 290 F.3d at 51.

B2 must demonstrate that the exercise of personal jurisdiction over VStock meets the requirements of both the Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment.  *See Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015).  Although for the most part these two requirements overlap, some daylight can be found between them.  *See id.*  Here, however, the court can bypass the long-arm statute, as personal jurisdiction is lacking under the constitutional standard.

"In order for a . . . court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'"

15

*Bristol-Myers Squibb Co. v. Superior Ct. of Calif.*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014)) (emphasis omitted). To satisfy this standard, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). Thus, "specific jurisdiction is confined to adjudication of issues arising from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Courts employ a three-part approach when analyzing specific jurisdiction, asking:

> (1) whether the claim 'directly arise[s] out of, or relate[s] to, the defendant's forum state activities;' (2) whether the defendant's in-state contacts 'represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable;' and (3) whether the exercise of jurisdiction is reasonable.

*Baskin-Robbins*, 825 F.3d at 35 (quoting *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 65 (1st Cir. 2014)). All three elements of the test must be met for personal jurisdiction to attach. *Id.*

The first step is dispositive here, as B2 has failed to demonstrate that its claims arise out of VStock's contacts with Massachusetts. It is true that

16

B2 is able to point to a number of contacts between VStock and the Massachusetts forum: VStock's contract to provide transfer services to Mazzal; VStock sent stock certificates to Mazzal shareholders in Massachusetts; it billed Mazzal in Massachusetts for its services; it exchanged emails with Trabelsi while he was in Massachusetts; it was providing services to Mazzal when Donohue made the misstatement at issue; it processed a transfer of the free-trading shares from Trabelsi's brokerage account to Telsi, whose address was in Massachusetts; and it mailed the "rejected" documents back to Trabelsi in Massachusetts.[6]

But a comparison of these contacts with B2's claims demonstrates an essential mismatch. For tort claims, the First Circuit encourages district courts to examine "whether the plaintiff has established 'cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action.)'" *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,

---

[6] B2 relies on at least three contacts which are wholly irrelevant to the relatedness inquiry. First, the fact that VStock has transacted business with other companies in Massachusetts says nothing about whether B2's claims against VStock arise out of its forum contacts. Second, the fact that VStock mailed information to Massachusetts shareholders on Mazzal's behalf has nothing to do with the claims asserted in this case. Third, the fact that the escrow agent, in reliance on Donohue's statement, wired funds to Massachusetts does not constitute a contact between VStock and Massachusetts.

142 F.3d 26, 35 (1st Cir. 1998) (quoting *United Elec., Radio & Mach. Workers*, 960 F.2d at 1089). None of VStock's recited Massachusetts forum contacts gave birth to B2's claims. VStock is incorporated in California and performed all the relevant transfer services from New York. Donohue's allegedly false statement, which is at the crux of the claims, was made in New York to a Utah-based escrow agent. Any torts VStock committed thus occurred outside of Massachusetts and have no relation to VStock's forum contacts.[7] *See Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289-291 (1st Cir. 1999) (concluding that an extra-forum breach of fiduciary duty does not satisfy the relatedness requirement). As a result, the contacts B2 identifies show only that its claims "arose out of the general relationship between the parties." That showing does not suffice for relatedness. *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995). The court is without jurisdiction over the remaining state-law claims against VStock.

---

[7] The only possible exception is B2's wrongful registration claim under Massachusetts law, which focuses on VStock's transfer of shares from Trabelsi's Interactive Brokerage account into Telsi's name at an address in Newton, Massachusetts. Even assuming that the other elements of personal jurisdiction might be met with respect to that claim, liability under the statute requires evidence of collusion, *see* Mass. Gen. Laws ch. 106, §§ 8-115(2), 8-404(a)(4), and nothing is pled to plausibly suggest collusion between Telsi (or Trabelsi, if no such person exists) and VStock.

ORDER

For the foregoing reasons, VStock's motion to dismiss is <u>ALLOWED</u>.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE